UNITED STATES of America, Appellee,

v.

David STEVENS, Defendant–Appellant.

No. 330, Docket 92–1304.

United States Court of Appeals,
Second Circuit.

Argued Oct. 21, 1992.

Decided Feb. 11, 1993.

Michael E. Gertzman, Asst. U.S. Atty., New York City (Otto G. Obermaier, U.S. Atty., S.D.N.Y., Andrew C. McCarthy, Asst. U.S. Atty., on the brief), for appellee.

Roger J. Bernstein, New York City, for defendant-appellant.

Before: KEARSE and MINER, Circuit Judges, and POLLAK, District Judge *.

KEARSE, Circuit Judge:

Defendant David Stevens appeals from a final judgment of the United States District Court for the Southern District of New York convicting him, following a jury trial before Kevin Thomas Duffy, *Judge*, of possessing and conspiring to possess heroin with intent to distribute, in violation of 21 U.S.C. § 841 (1988 & Supp. II 1990) and *id.* § 846 (1988). Stevens was sentenced principally to 405 months' imprisonment, to be followed by a life term of supervised release, and was fined $2,000,000. On appeal, he contends principally (1) that he was unfairly prejudiced by the government's failure to make pretrial disclosure of certain evidence used to impeach his testimony at trial, (2) that the district court incorrectly instructed the jury concerning his defense of duress, and (3) that the district court erred in its application of the federal Sentencing Guidelines ("Guidelines"). For the reasons below, we affirm the conviction but vacate the sentence and remand for resentencing.

## I. BACKGROUND

The present prosecution of Stevens, culminating in his conviction in 1992 on the above narcotics charges, has its roots in his arrest in 1990 on charges of participation in a stolen-car ring (the "Ring"). The evidence at trial in the present case, taken in the light most favorable to the government, revealed the following.

### A. *The 1990 Arrest and Stevens's Cooperation Agreement*

The Ring specialized in stealing luxury cars and selling them after altering their identification numbers and fabricating documentation to match; Stevens was one of the Ring's salesmen. When arrested on federal charges with respect to his participation in that operation, Stevens, who had previously given local police officers information about the Ring after a friend and

fellow Ring member was killed, told the arresting officers he wished to cooperate with the Federal Bureau of Investigation ("FBI"). As a result, in December 1990, Stevens entered into a cooperation agreement with the United States Attorney's Office for the Southern District of New York. Pursuant to that agreement, he was allowed to plead guilty in July 1991 to an indictment charging him only with possession of a vehicle with an altered vehicle identification number, and sentencing on that charge was postponed.

In the meantime, Stevens gave the government information about the Ring, allowed the government to record conversations with targets of its investigation, and testified before a Grand Jury against several Ring members, including one Rafael Perez. The recorded conversations included a January 1991 telephone call placed by Stevens to Perez from a public telephone near Yankee Stadium. Partly as a result of Stevens's cooperation, the government obtained indictments in the spring of 1991 against a number of Ring members, including Perez.

### B. *Perez's Accusations and the October 1991 Heroin Transaction*

Perez, after his own arrest, approached the Newark, New Jersey office of the Drug Enforcement Agency ("DEA") and offered to provide that agency with information. His offer was accepted, and Perez subsequently entered into a cooperation agreement. Pursuant to that agreement, Perez told the DEA that Stevens was importing heroin.

Perez introduced undercover DEA agent Gregory Hilton to Stevens in early September 1991 during a recorded telephone conversation. In late September, Stevens, Perez, and Hilton met at a diner in New Jersey. At the meeting, Stevens quoted Hilton heroin prices that varied according to, *inter alia*, quantity and terms of payment. Hilton told Stevens he would get back to Stevens after Hilton had spoken to

---

* Honorable Louis H. Pollak, of the United States District Court for the Eastern District of Pennsylvania, sitting by designation.

his "investors." Hilton telephoned Stevens about two weeks later, saying that he wanted to purchase about "a thousand" grams of heroin. Stevens replied, "We'll give you, like, half and half," which Hilton understood to mean that Stevens would sell him only 500 grams of heroin at a time. Stevens indicated that the price of 500 grams would be $90,000.

On the following day, October 11, Hilton telephoned Stevens to attempt to arrange the sale. During that conversation, Stevens told Hilton, "We'll do it one at a time," meaning that he would sell 100 grams of heroin at a time. Later that afternoon, Hilton telephoned Stevens to make further arrangements. Hilton said he had $90,000; Stevens replied that he had 500 grams. They agreed to meet at a restaurant, and Hilton went there to wait for Stevens. When Stevens did not appear for several hours, Hilton telephoned him to find out where he was. Stevens said he would arrive in about 20 minutes; he also said that, because this was his first sale to Hilton, he would only bring 100 grams of heroin that night. Stevens assured Hilton that if all went well, he would eventually sell Hilton the remaining 400 grams.

Stevens arrived at the restaurant about 20 minutes later, apologized for being late, and asked Hilton to step outside. The two crossed the street and headed toward three double-parked vehicles. When they reached the middle one, its driver lowered the rear window and turned on the interior lights. There were approximately five people inside, including one Linda Smith. Stevens told Smith to show Hilton the package. Smith removed from beneath her coat a clear plastic bag containing a white powdery substance; another passenger took the bag, showed it to Hilton, and after the agent acknowledged seeing it, replaced it inside Smith's coat. Stevens and Hilton stepped away and proceeded to negotiate a price of $20,000 for the bag. Hilton said he had to get the money from his car; while walking away, he signaled other agents, who moved in and arrested Stevens and nine others. The bag shown to Hilton was seized and determined to contain 96 grams of heroin. In a later search, the police found a .32 caliber automatic pistol between the front seats of one of the vehicles.

## C. *The Present Prosecution*

Stevens was indicted on one count of possessing heroin with intent to distribute, in violation of 21 U.S.C. § 841, and one count of conspiring to do so, in violation of § 846. Prior to trial, he moved pursuant to Fed.R.Crim.P. 16(a)(1)(A) & (C) for, *inter alia,* "production of all of [his] statements to government agents," including statements concerning "two rings of individuals involved in car theft and alteration of motor vehicle identification numbers." Stevens argued that such statements were material to his defense, and hence discoverable, because he would be "subject to cross-examination concerning those statements if he elect[ed] to testify" and because "many of the statements concern the informants who have made the present allegations against" him. (Memorandum of Law in Support of Pretrial Motions, Nov. 26, 1991, at 3–4.) The Government opposed Stevens's motion to the extent that it sought statements made by Stevens while he was acting as a government agent during its investigation of the Ring, taking the position that such statements could not be used at trial in connection with its case in chief, and therefore were not subject to disclosure under Rule 16(a)(1)(A). Stevens did not press his motion, advising the court at a hearing that "[t]he issue as to production of Mr. Stevens' statements is largely resolved by agreement with the government."

At trial, Stevens relied principally on a defense of duress, contending that Perez had pressured him into participating in the attempted heroin sale in order to prove that he was not an informant. In his opening statement, Stevens's counsel stated that Stevens had been "set up, coerced, if you will, in a single syllable word, framed, by an armed, violent and dangerous career criminal whom [the prosecutor] did not tell you about. That individual's name is Rafael Perez, commonly known as Ralph Perez." Counsel urged the jury to

ask yourselves, was David Stevens framed in this case? Was he set up? Was Ralph Perez the drug dealer that the government didn't bother to go after in this matter? And did he coerce David Stevens into doing the things that the government says happened?

In support of the duress theory, Stevens testified in detail as to his cooperation with the government in the investigation of the Ring. According to Stevens, Perez and other Ring members "all thought [Stevens] was squealing," and Perez twice asked him to participate in heroin transactions because they wanted "reassurance." The first proposed transaction, which Stevens was able to avoid, was said to have been suggested during the government-recorded Yankee Stadium telephone conversation in early 1991, when Perez allegedly attempted to get Stevens to agree "to sell some drugs to [sic] for him." Stevens testified that Perez did not specifically "say 'drugs' over the phone" but rather used the code word "oranges," a word Stevens had "noticed being used between himself and [another Ring member] in regards to drug transactions." Stevens testified that the second transaction proposed to him by Perez was the aborted October 11, 1991 heroin sale that gave rise to the present prosecution, and that it was Perez who obtained the heroin and gave it to Smith for the sale to Hilton. According to Stevens, on the night the sale was to take place, Perez's source was apparently delayed and Stevens had hoped to stall and to abort the sale. However, Perez was with him at the time of Hilton's last call and accused him of stalling and "trying to blow the deal"; Stevens said Perez told him of shooting another Ring member Perez also had suspected of being an informant.

On cross-examination, the government had Stevens listen to the tape of the Yankee Stadium telephone conversation and forced him to concede that the word "oranges" had not been used. In addition, to refute Stevens's contention that he had tried to avoid making the sale to Hilton but was compelled to proceed because Perez was with him when Hilton called, the government introduced telephone records showing that just after Hilton called, Stevens telephoned Perez's beeper number.

The jury found Stevens guilty of both of the offenses with which he was charged. He moved for a new trial based on the government's failure to make pretrial disclosure, pursuant to Fed.R.Crim.P. 16(a)(1), of the telephone records and the tape recording of the Yankee Stadium telephone call. The district court denied the motion, finding that pretrial disclosure was not required because the telephone records were not material within the meaning of Rule 16 and because the Yankee Stadium telephone call did not become relevant until after Stevens had testified.

As discussed in Part II.C. below, Stevens was sentenced to 405 months' imprisonment, to be followed by a lifetime of supervised release, and was ordered to pay a $2,000,000 fine. This appeal followed.

## II. DISCUSSION

On appeal, Stevens contends principally (1) that he is entitled to a new trial because of the government's failure to comply with Rule 16 and because of the district court's jury charge with respect to duress, and (2) that his sentence should be vacated because the court erred in applying the Guidelines. Though we see no basis for a new trial, we find merit in Stevens's major challenges to his sentence.

### A. *The Government's Disclosure Obligations Under Rule 16*

█ Stevens pursues his contention that Fed.R.Crim.P. 16(a) required the government to provide him, prior to trial, with copies of telephone company records for the telephone he used on the night he was arrested and of the tape recording of his Yankee Stadium telephone conversation with Perez. Although we believe the government should have given Stevens a copy of the tape recording at least prior to his testifying at trial, we find no basis for reversal.

█ To the extent pertinent to the telephone records, Rule 16(a)(1) provides that upon a defendant's request, the gov-

ernment must permit the defendant to inspect and copy papers and documents in its possession, custody, or control, "which are material to the preparation of the defendant's defense or are intended for use by the government as evidence in chief at the trial." Fed.R.Crim.P. 16(a)(1)(C). Evidence that the government does not intend to use in its case in chief is material if it could be used to counter the government's case or to bolster a defense; information not meeting either of those criteria is not to be deemed material within the meaning of the Rule merely because the government may be able to use it to rebut a defense position. *See, e.g., United States v. Delia,* 944 F.2d 1010, 1018 (2d Cir.1991). Nor is it to be deemed material merely because it would have dissuaded the defendant from proffering easily impeached testimony. *See United States v. Gleason,* 616 F.2d 2, 24 (2d Cir.1979), *cert. denied,* 444 U.S. 1082, 100 S.Ct. 1037, 62 L.Ed.2d 767 (1980). An appellate court, in assessing the materiality of withheld information, considers not only the logical relationship between the information and the issues in the case, but also the importance of the information in light of the evidence as a whole. To warrant a new trial, " '[t]here must be some indication that the pretrial disclosure of the disputed evidence would have enabled the defendant significantly to alter the quantum of proof in his favor.' " *United States v. Maniktala,* 934 F.2d 25, 28 (2d Cir.1991) (quoting *United States v. Ross,* 511 F.2d 757, 762–63 (5th Cir.), *cert. denied,* 423 U.S. 836, 96 S.Ct. 62, 46 L.Ed.2d 54 (1975)).

Stevens has not shown that the telephone records of his October 11 call to Perez were material within the meaning of Rule 16. He does not suggest that he would have been able to use the records to bolster his defense or to counter the government's case. The records were used by the government at trial only to rebut Stevens's testimony that he was with Perez on the night of the attempted sale. His position as to their materiality boils down to an argument that if he had known the government had these records he might have reconsidered his decision to testify or formulated a more effective defense strategy. It is clear that the records did not become pertinent until Stevens presented testimony that they could impeach, and hence Rule 16 did not require their disclosure.

■ The government's failure to furnish Stevens with a copy of the tape recording of his Yankee Stadium telephone conversation with Perez presents a closer question. To the extent pertinent to that conversation, Rule 16(a)(1) provides that upon the defendant's request, the government must disclose "any relevant ... recorded statements made by the defendant" that are within its custody or control. Fed. R.Crim.P. 16(a)(1)(A). Relevance, within the meaning of this provision, is to be interpreted broadly in deference to the policy judgment that "disclosure, rather than suppression, of relevant materials ordinarily promotes the proper administration of criminal justice." *Dennis v. United States,* 384 U.S. 855, 870, 86 S.Ct. 1840, 1849, 16 L.Ed.2d 973 (1966); *see also United States v. Bailleaux,* 685 F.2d 1105, 1114 (9th Cir.1982) ("Rule 16(a)(1)(A) can fully serve its intended purpose only if the Government takes a broad view of what is relevant for purposes of that provision."); Fed.R.Crim.P. 16 Advisory Committee Note (rejecting narrow construction of defendant's right to discover own statements). Thus, the Rule gives a "defendant 'virtually an absolute right' " to his own statements "in the absence of highly unusual circumstances of a sort that would otherwise justify a protective order." 2 C. Wright, *Federal Practice and Procedure* § 253, at 46 (1982); *see also United States v. Gleason,* 616 F.2d at 24–25 (no obligation to disclose when material was relevant only to defendant's perjurious testimony which could not have been anticipated). As to statements within the Rule, the government has a continuing obligation to disclose. *See* Fed.R.Crim.P. 16(c).

Though often it is difficult for the government to know what statements may be relevant from the defendant's point of view, and though the Yankee Stadium telephone call was made in the course of an unrelated investigation, the policy favoring disclosure should perhaps have led the gov-

ernment to reason that, in this battle of arrestees accusing each other of wrongdoing, a prior recorded conversation between the two could easily be relevant in the prosecution of either. Indeed, an FBI agent who monitored the Yankee Stadium telephone conversation asked Stevens immediately after that conversation whether he was dealing drugs; from the mere asking of the question an inference could be drawn that the conversation had included discussion that could be interpreted as narcotics-related. Even assuming, however, that the government could not envision any relevance to the Yankee Stadium phone conversation prior to trial, Stevens's opening statement, in which his attorney argued that Stevens had been "set up" and "coerced" by Perez, was sufficient to awaken the government to the possible relevance of the recording of his conversation with Perez. Given its continuing duty to disclose, the government should have provided Stevens with that recording at least prior to his testifying.

■ Nonetheless, the government's withholding of evidence that should have been disclosed does not automatically entitle Stevens to a new trial, for a defendant must show that the failure to disclose caused him substantial prejudice. *See, e.g., United States v. McElroy*, 697 F.2d 459, 465 (2d Cir.1982). In assessing that question, the court analyzes the nature of the evidence sought, the extent to which it bore on critical issues in the case, the reason for its nonproduction, and the strength of the government's untainted proof. *See United States v. Petito*, 671 F.2d 68, 74 (2d Cir.), *cert. denied*, 459 U.S. 824, 103 S.Ct. 56, 74 L.Ed.2d 60 (1982). We conclude that the nondisclosure here was not so prejudicial as to entitle Stevens to a new trial, for the record as a whole substantially belied his claim of duress. For example, when Stevens was asked immediately after the Yankee Stadium call whether he was dealing in drugs, providing him an obvious opportunity to disclose any untoward suggestion or pressure from Perez, Stevens responded simply, "No." He neither stated nor gave any other indication to government agents that he was afraid of Perez. Further, had

Stevens been subjected to coercion as he claimed, there was a span of many months during which he could have reported that fact to the FBI, with whom he was supposedly cooperating. Moreover, the evidence that on the night of the aborted sale Perez was not in Stevens's presence either (a) when Hilton last called or (b) when Stevens attempted to complete the sale belied any claim that Stevens was acting solely from an immediate fear for his life. Against this array of evidence, and in light of the showing a defendant must make in order to establish a defense of coercion, *see* Part II.B. below, the contradiction of Stevens's testimony that "oranges" were discussed in the Yankee Stadium conversation pales to insignificance. We conclude that though the government should have provided Stevens with a copy of his recorded conversation with Perez at least before Stevens testified, the failure to do so does not require a new trial.

### B. *The Instruction on Duress*

■ In connection with his duress defense, Stevens urged the trial court to instruct the jury that it should acquit if it found he had good reason to believe at any time during the conspiracy that he would be seriously harmed if he refused to participate in the October heroin transaction. The court instead directed the jury to assess whether Stevens was in fear for his life at the time of the attempted sale. We see no error.

■ In order to establish a claim of duress such as to constitute a legal excuse for criminal conduct, a defendant must show that (a) " 'at the time the conduct occurred,' " he was subjected to actual or threatened force, (b) the force or threat was of such a nature as to induce a well-founded fear of impending death or serious bodily harm, and (c) there was no reasonable opportunity to escape from the force or threat other than by engaging in the otherwise unlawful activity. *United States v. Mitchell*, 725 F.2d 832, 837 (2d Cir.1983) (quoting *United States v. Agard*, 605 F.2d 665, 667 (2d Cir.1979)); *see also United States v. Bakhtiari*, 913 F.2d 1053,

1057 (2d Cir.1990), *cert. denied,* —— U.S. ——, 111 S.Ct. 1319, 113 L.Ed.2d 252 (1991); *United States v. Alicea,* 837 F.2d 103, 106 (2d Cir.), *cert. denied,* 488 U.S. 832, 109 S.Ct. 88, 102 L.Ed.2d 64 (1988). Evidence of a mere "generalized fear" does not satisfy the requirement of a well-founded fear of impending death or serious bodily harm; rather, there must have been a threat that was specific and prospects of harm that were immediate. *See, e.g., United States v. Esposito,* 834 F.2d 272, 276 (2d Cir.1987); *United States v. Agard,* 605 F.2d at 668. "To make fear of one's life sufficient to excuse ... the commission of a crime, the fear must be more than a general apprehension of danger, particularly if one has the chance to escape or to seek the protection of the Government." *United States v. Housand,* 550 F.2d 818, 825 (2d Cir.), *cert. denied,* 431 U.S. 970, 97 S.Ct. 2931, 53 L.Ed.2d 1066 (1977).

The district court in this case instructed the jury in accordance with these precedents. Stevens's proposed charge was incorrect, and his challenge to the charge as given is meritless.

## C. *The Sentencing Issues*

The Probation Department's Presentence Report ("PSR") prepared on Stevens, using the November 1, 1991 version of the Guidelines, calculated his base offense level as 28, based on the 500 grams of heroin Stevens had negotiated to sell. *See* Guidelines § 2D1.1(c)(8). It recommended increasing the offense level by seven levels to 35, based on the combination of (a) Stevens's role as an organizer, *see id.* § 3B1.1(c) (two levels), (b) his commission of the crime while on release prior to being sentenced for his Ring-related offense, *see* 18 U.S.C. § 3147 (1988) and Guidelines § 2J1.7 (three levels), and (c) the presence of a firearm during the narcotics offense, *see* Guidelines § 2D1.1(b)(1) (two levels). Since Stevens had not yet been sentenced for his 1990 Ring-related offense, and he had no other record of convictions, his criminal history category ("CHC") was I. *See id.* §§ 4A1.2(a)(4), 4A1.1(c), 5A Sentencing Table. This CHC, with the offense level of 35, resulted in a recommended imprison-

ment range of 168–210 months and a four-to-five-year period of supervised release. *See id.* § 5A Sentencing Table. As for a fine, the Guidelines provided a range from $20,000 to $2,000,000, the statutory maximum, *see id.* §§ 5E1.2(c)(3) and (4), but the PSR concluded that, "[b]ased on [Stevens's] financial profile and work history, it appears that he is unable to pay a fine."

In sentencing Stevens, the district court, over Stevens's objections, adopted the PSR's calculations as to the proper base offense level and, with few exceptions, the PSR's recommendations for increases in offense level. One exception was that instead of making a two-level upward adjustment for Stevens's role in the offense as recommended by the PSR, the court made a four-level adjustment. In addition, the court made a two-level upward adjustment for obstruction of justice pursuant to Guidelines § 3C1.1 because it found that Stevens had perjured himself at trial. Having thus arrived at an offense level of 39, the court decided, again over Stevens's objection, to depart upward in criminal history category by two steps. Use of CHC III with a base offense level of 39 resulted in a Guidelines range of 324–405 months' imprisonment. The court imposed a 405-month prison sentence, to be followed by lifetime supervised release. It also ordered Stevens to pay a fine of $2,000,000.

Stevens contends that the court erred (a) in calculating his base offense level as 28 on the basis of 500 grams of heroin, rather than as 24 on the basis of the 96 grams actually seized, *see* Guidelines § 2D1.1(c); (b) in making upward adjustments to the offense level based on weapon possession, obstruction of justice, and role in the offense; (c) in departing upward from the Guidelines range; and (d) in imposing the $2,000,000 fine. Finding a number of procedural flaws, we vacate the sentence and remand for resentencing.

### 1. The Base Offense Level

■ A defendant convicted of a narcotics offense involving a transaction that was under negotiation but not completed should

normally have his base offense level calculated on the basis of the quantity of narcotics that was under negotiation. *See* Guidelines § 2D1.4(a). "However, where the court finds that the defendant did not intend to produce and was not reasonably capable of producing the negotiated amount, the court shall exclude from the guideline calculation the amount that it finds the defendant did not intend to produce and was not reasonably capable of producing." Guidelines § 2D1.4 Application Note 1; *see United States v. Jacobo*, 934 F.2d 411, 416 (2d Cir.1991). Where the defendant has disputed his intent or ability to produce the amount under negotiation, the district court should make a finding on that question. *See, e.g., id. United States v. Negron*, 967 F.2d 68, 72–73 (2d Cir.1992) (remanding to permit district court to determine whether defendant knew of conspiracy's scope or whether conspiracy's trafficking in certain types of narcotics was reasonably foreseeable).

Stevens contended in the district court that he was not capable of producing 500 grams of heroin, and he argues here that the court failed to make an adequate finding as to his ability to produce that quantity. The latter contention appears to have some merit. At the sentencing hearing, the court referred to the quantity of heroin at issue variously as, *inter alia*, "500 grams," "5 kilograms," and "one kilo." When the prosecutor inquired whether the court had made a finding as to "the amount of drugs for which this was a conspiracy" (Sentencing Transcript, May 20, 1992 ("Tr."), at 26), the court responded as follows:

> THE COURT: . . . I found that there was talk of five kilos and we're sure there is every indication to me at least five kilos was involved.
>
> MR. HAYES [Assistant United States Attorney]: Your Honor, I am not sure if I know the federal weight system. I think what we had was the most discussion was for a thousand grams, one kilogram, in the September meeting and then the 500 gram delivery. I may have missed it.
>
> THE COURT: I don't think you missed it. I missed the number—this is what I am talking about, and I have got to tell you the amount as charged—does it not say a number here?
>
> MR. BERNSTEIN [Attorney for Stevens]: It says in excess of 500 grams, your Honor.
>
> THE COURT: In excess of 500 grams? Okay. So how many grams to a kilogram?
>
> MR. HAYES: There are a thousand grams to a kilogram, your Honor.
>
> THE COURT: All right. So I am referring to five kilograms, should have said 500 grams instead of kilograms.

(*Id.* at 26–27.)

The sentencing court seems to have been unclear as to what quantity of heroin was negotiated and to have been preoccupied with questions other than Stevens's ability to produce as much as 500 grams. We see no indication that the court addressed the latter issue. We therefore remand for the court to consider the amount Stevens was able to produce. If it finds that Stevens was not reasonably capable of producing 500 grams, it should set his base offense level at 24 rather than 28.

### 2. The Adjustment for Stevens's Role in the Offense

Section 3B1.1 of the Guidelines, focusing on a defendant's role in the offense, allows a sentencing court to increase the offense level as follows:

(a) If the defendant was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive, increase by 4 levels.

(b) If the defendant was a manager or supervisor (but not an organizer or leader) and the criminal activity involved five or more participants or was otherwise extensive, increase by 3 levels.

(c) If the defendant was an organizer, leader, manager, or supervisor in any criminal activity other than described in (a) or (b), increase by 2 levels.

An application note suggests that the

> [f]actors the court should consider [in determining whether a defendant was an organizer or a manager] include the exer-

cise of decision making authority, the nature of participation in the commission of the offense, the recruitment of accomplices, the claimed right to a larger share of the fruits of the crime, the degree of participation in planning or organizing the offense, the nature and scope of the illegal activity, and the degree of control and authority exercised over others. There can, of course, be more than one person who qualifies as a leader or organizer....

Guidelines § 3B1.1 Application Note 3; *see also United States v. Pitre*, 960 F.2d 1112, 1126 (2d Cir.1992); *United States v. Parker*, 903 F.2d 91, 104 (2d Cir.), *cert. denied*, 498 U.S. 872, 111 S.Ct. 196, 112 L.Ed.2d 158 (1990).

■ In enhancing a defendant's sentence based on his role in the offense, a district court must make specific factual findings as to that role. *See, e.g., United States v. Lanese*, 890 F.2d 1284, 1294 (2d Cir.1989), *cert. denied*, 495 U.S. 947, 110 S.Ct. 2207, 109 L.Ed.2d 533 (1990). Though "requiring a district judge to make specific factual findings in determining the applicable sentencing guidelines may 'interfere with the smooth operation of the sentencing hearing,'" specific findings are needed to permit appellate review of the sentence imposed. *Id.* (quoting *United States v. Mejia–Orosco*, 867 F.2d 216, 221 (5th Cir.), *cert. denied*, 492 U.S. 924, 109 S.Ct. 3257, 106 L.Ed.2d 602 (1989)); *see also United States v. Palta*, 880 F.2d 636, 639–41 (2d Cir.1989).

The PSR in the present case characterized Stevens's role in the heroin transaction as that of a middleman and suggested increasing his offense level by two. Stevens did not object to this increment. The government, however, contended that it was too small, requesting instead a four-level enhancement. Stevens contends that in imposing the four-level enhancement, the court erred in failing to make factual findings in support of its conclusion. We agree.

At the sentencing hearing, the court stated as follows:

The Probation Department says Stevens did not exercise control or authority over all of the participants in the offense. I have absolutely no idea where the heck they got that. I really don't know where they come up with some of these things.

The probation officer was neither here nor, to the best of my knowledge, did the probation officer review the entire transcript....

There is no doubt in my mind Stevens perhaps was an equal partner, but at least as a partner with Mr. Hamada controlled the whole operation, and that included more than five people. Under the circumstances, the finding made by the Probation Office is specifically rejected.

(Tr. 9–10.) In rejecting Stevens's objection to this additional increment, the court stated that it was

pretty sure that if the commissioners were asked specifically if you have an organization which is dealing in 5 kilograms, whether that is an ad hoc type thing or whether that's an organization which is a continuing criminal organization, they would tell you ... that is far from being an ad hoc type thing.

You know, we had statements floating around, one of them that the Kellums made, that there were other trips and other times and so on and so forth. This is not just a one-shot affair, so I disagree. I don't know where the Probation Department came up with their ideas.

(*Id.* at 11–12.)

■ These statements, though questioning the PSR's basis for concluding that Stevens was a middleman, and stating that sales of large quantities of narcotics are rarely made without a supporting organization, did not disclose the court's basis for considering Stevens an organizer or leader of this organization. While plainly a large number of persons were involved in the aborted heroin transaction—nine were arrested with Stevens—it is not clear what evidence the court relied on in reaching its conclusion that Stevens was one of their leaders. It did not suffice for the court simply to state that it had "no doubt" that

Stevens (with Hamada) controlled the operation, without giving some explanation as to the evidentiary basis for its view. Accordingly, the court should make appropriate factual findings on remand and, on the basis of its findings, make any adjustment warranted by § 3B1.1.

### 3. The Upward Departure

 Under the Guidelines, Stevens's criminal history category was I. The district court, in sentencing him to a 405–month prison term, departed upward, applying a criminal history category of III. Stevens contends that the departure was improper principally because (1) the court failed to state its reasons for the departure, and (2) to the extent that the departure was based on the fact that Stevens was yet to be sentenced for his Ring-related offense, it will result in an impermissible double counting. We conclude that the departure questions warrant reconsideration, clarification, and explanation.

The Guidelines recognize that a defendant's assigned criminal history category may not always "adequately reflect the seriousness of the defendant's past criminal conduct or the likelihood that the defendant will commit other crimes." Guidelines § 4A1.3 Policy Statement. Accordingly, the sentencing court may exercise its discretion to depart upward by increasing the CHC in order to provide a more accurate reflection of that conduct or likelihood. In so doing, the court is required to " '1) determine which category best encompasses the defendant's prior history, and 2) use the corresponding sentencing range for that category "to guide its departure." ' " United States v. Sappe, 898 F.2d 878, 882 (2d Cir.1990) (quoting United States v. Cervantes, 878 F.2d 50, 53 (2d Cir.1989)). With respect to a CHC departure of more than one step, "[t]he district court must ... proceed sequentially through the categories, beginning with the defendant's original criminal history category and then proceeding in order through the higher categories, 'considering whether the next higher category adequately reflect[s] the seriousness of the defendant's record and, only upon finding it inadequate, moving on to a still higher category.' " United States v. Jakobetz, 955 F.2d 786, 806 (2d Cir.) (quoting United States v. Coe, 891 F.2d 405, 412–13 (2d Cir.1989)), cert. denied, — U.S. ——, 113 S.Ct. 104, 121 L.Ed.2d 63 (1992); see also United States v. Diaz–Collado, 981 F.2d 640, 644 (2d Cir.1992). But cf. United States v. Rodriguez, 968 F.2d 130, 140 (2d Cir.) (strict level-by-level analysis not necessary with respect to offense-level departure; sentencing court need only refer to analogous Guidelines provisions to guide extent of departure), cert. denied, — U.S. ——, 113 S.Ct. 140, 121 L.Ed.2d 92 (1992). In sum, the court must state its reasons both for departing and, with some specificity, for the extent of a multi-step CHC departure. See, e.g., United States v. Sappe, 898 F.2d at 882.

The record as to the court's reasons for the departure and the extent of departure in the present case is not entirely clear. In alerting the parties to its view that a CHC departure was warranted, the court noted the PSR's position that there appeared to be no basis for a departure, and stated as follows:

> Well, I disagree with that. The fact is this becomes something which is not included in the guidelines at all, because the defendant was not only on bail at the time the offense was committed but supposedly was cooperating with the government. The reason he was on bail, obviously, was that he was supposedly cooperating with the government. It is a status which is not covered, to the best of my knowledge, in the guidelines.
>
> Now, the suggestion could be made that that would be taken into account in a sentence for the other crimes. It can't be. If there is going to be any enhancement, it has to be done here and now.

(Hearing Transcript, May 19, 1992, at 3–4.) In response, the government wrote the court on May 20, 1992 ("May 20 Letter"), urging a two-step criminal history departure on the grounds that the Guidelines did not adequately account for the facts that (a) Stevens was yet to be sentenced for his Ring-related offense, (b) his present offense occurred while he was cooperating

with the government, and (c) his behavior exhibited a high propensity for recidivism. When the court announced its sentence on May 20, it initially stated simply that "[i]t is the judgment of the court that [Stevens] be remanded to the custody of the Attorney General for a period of 405 months, that is 33 years plus." (Tr. 33.) Upon inquiry from the prosecutor, the court explained only that its sentence reflected an offense level of 39 and a criminal history category of III. (*Id.* at 35.) Thus, at sentencing, the court gave no explanation either for the departure or for departing by two steps rather than one. Although on this appeal the government argues that the court gave a sufficient explanation, in the district court the government urged the sentencing judge to clarify the basis for his departure. Thus, it wrote to the court expressing concern

> that in imposing the sentence of 405 months your Honor did not explicitly state the reason for assigning the defendant a criminal history category of three. Although your Honor's comments suggest that the Court adopted the reasoning contained in the government's May 20, 1992 letter, the Court's findings do not appear to be fully set forth on the record. I bring this to the Court's attention so that any clarification of the record your Honor finds appropriate can be made before the appeal in this case.

(Government's Letter dated June 3, 1992.) The court made no further comment, and we see two respects in which clarification is needed.

First, the court never indicated the basis for its view that its CHC departure should be two steps rather than one. Its May 19 statements alerting the parties that it was considering a departure included no quantification. Hence, we must remand for a finding as to why a one-step departure would be, in the court's view, inadequate.

Second, the qualitative basis for the departure in the present case has been obscured by the government's May 20 suggestion of possible departure bases other than the factor referred to by the court on May 19, together with the June 3 letter's

suggestion that the court appeared to have adopted the bases urged in the May 20 Letter. The lack of clarity is significant here, for although the factor referred to by the court on May 19 provided a permissible basis for departure, *cf. United States v. Keats*, 937 F.2d 58, 67 (2d Cir.) (upholding one-step CHC departure on basis, *inter alia*, that defendant's offense conduct was committed while he was on release for the purpose of cooperating with the FBI), *cert. denied*, —— U.S. ——, 112 S.Ct. 399, 116 L.Ed.2d 348 (1991), one of the other grounds urged by the government did not provide a permissible basis.

■ In its May 20 Letter requesting a two-step CHC departure, the government contended that the fact that Stevens had not yet been sentenced on his Ring-related offense provided a basis for one step of that departure. Its argument was that if Stevens had been sentenced on that offense prior to sentencing on the present offense his CHC here would have been II, and that that fact justified departing upward here by one step in order to sentence him as if his CHC were in fact II. We conclude that, since both of Stevens's offenses are federal, the overall Guidelines scheme provides for effect to be given to both offenses in specified ways, and that adoption of the government's reasoning would result in a double-counting that the Guidelines do not countenance.

Under the Guidelines, a defendant's CHC is calculated on the basis of points assigned on account of his record of prior criminal behavior. For example, a defendant who has previously been convicted of and sentenced for a crime is assigned three points for a prison sentence exceeding 13 months, *see* Guidelines § 4A1.1(a), two points for a prison sentence of at least 60 days but not more than 13 months, *see id.* § 4A1.1(b), and one point for each other sentence, up to a total of four points, not counted under §§ 4A1.1(a) or (b), *see id.* § 4A1.1(c). If, as in the present case, a defendant has been convicted of but not yet sentenced for an offense that would be countable had he already been sentenced, the Guidelines require that he be given one point. *See id.*

§ 4A1.2(a)(4) ("Where a defendant has been convicted of an offense, but not yet sentenced, such conviction shall be counted as if it constituted a prior sentence under § 4A1.1(c) if a sentence resulting from that conviction otherwise would be countable."). A defendant who has no points or one point is assigned a CHC of I; a defendant who has two or three points is assigned a CHC of II. *See* Guidelines Part 5A Sentencing Table.

Since Stevens had not been sentenced on his Ring-related conviction, § 4A1.2(a)(4) required that he be given one point. Since he had no other record of convictions, his point total was one, and his assigned CHC was I. Thus the Guidelines specified the effect to be given to the fact that Stevens had been convicted but not yet sentenced.

In arguing for a departure notwithstanding the Guidelines' specificity, the government relies on our decisions in *United States v. Keats*, 937 F.2d at 67; and *United States v. Sturgis*, 869 F.2d 54, 57 (2d Cir.1989), which upheld CHC departures for defendants awaiting sentencing on various other crimes. Those cases, however, involved defendants who were to be sentenced in state court for state offenses. Since state-court sentencing is not governed by the federal Guidelines, we viewed the district court as having discretion to depart on that basis because if the federal court does not depart to take account of the unsentenced state crimes, there is no assurance that the entire range of the defendant's pertinent history will be considered in either proceeding.

Here, the conviction for which Stevens was awaiting sentence was a federal conviction. His sentencing for the Ring-related offense is thus to occur under the Guidelines, and if at that time he is under sentence for the present offense, he must be given three criminal history points as a result of the present offense, resulting in a CHC of II, rather than the one point, and corresponding CHC of I, he would have been given if sentence in the present case had not yet been imposed. Thus, although it is true that if the sequence of sentencing had matched the sequence of the offenses Stevens would have been assigned a greater criminal history for the present offense, that parallelism would also have resulted in a lower CHC than will be assigned in connection with the Ring-related offense. Allowing an upward departure based solely on the fact that sentencing was pending for another federal offense would in effect have both sentencing judges calculate the defendant's sentence as if the defendant had previously been sentenced on the other offense first. Since the Guidelines make explicit provision for the criminal history treatment of a defendant who has been convicted but not yet sentenced, we conclude that a departure on this basis for a defendant awaiting sentencing on a federal offense would result in a double counting that was not intended by the policy statement in Guidelines § 4A1.3, and that a departure on this basis is impermissible.

We recognize that the district court in fact may not have intended to adopt the pendency of Stevens's Ring-related sentencing as a basis for its departure, since this factor was not mentioned by the court in its May 19 notice to the parties but was only raised by the government thereafter. And since the only factor the court referred to on May 19 provided a valid basis for departure, we might, had the court departed by only one CHC step, have affirmed the sentence on the ground that the court plainly had a valid basis for its decision. *See, e.g., Williams v. United States*, — U.S. —, — — —, 112 S.Ct. 1112, 1120–21, 117 L.Ed.2d 341 (1992) (remand not automatically required to rectify an incorrect application of the Guidelines if court of appeals can determine that sentencing court would have imposed the same sentence had it not relied on the invalid factors). However, in announcing its intention to depart, the district court did not quantify the proposed departure. Thus, we have no way of knowing whether or not part of the two-step departure ultimately imposed reflected consideration of the impermissible basis. Accordingly, a remand is required so that the court may reconsider the extent of its departure and clarify the basis for any departure and its extent.

#### 4. The $2,000,000 Fine

 Section 5E1.2 of the Guidelines provides that "[t]he court shall impose a fine in all cases, except where the defendant establishes that he is unable to pay and is not likely to become able to pay any fine." Guidelines § 5E1.2(a). In imposing a fine, a court is to consider, *inter alia,* "the defendant's income, earning capacity, and financial resources." 18 U.S.C. § 3572(a)(1) (1988). The court must afford the defendant at least a minimal opportunity to show that he lacks the ability to pay the fine proposed by the court. *See United States v. Marquez,* 941 F.2d 60, 65–66 (2d Cir.1991). If the "defendant is represented by (or was determined eligible for) assigned counsel," that fact is a "significant indicator[ ] of present inability to pay any fine." Guidelines § 5E1.2 Application Note 3.

In the present case, Stevens was represented by assigned counsel, and the PSR noted that, based on his financial profile and work history, "it appears that he is unable to pay a fine." The sentencing court rejected the PSR's conclusion, stating that the probation department "didn't make a finding, to the best of my knowledge, and I am willing to bet if they scratch hard enough, they will find he ... does have funds." (Tr. 34.) The court gave no indication that it considered the fact that Stevens had been assigned counsel, and it made no mention of Stevens's ability to pay except to state its view that "most of the drug dealers of this world make lots and lots and lots of money, and most of them hide it." (*Id.*)

On remand, the district court must give Stevens an opportunity to come forward with evidence of his inability to pay and must consider the appropriate factors in determining whether or not to impose a fine and if so, in what amount.

#### 5. Stevens's Other Sentencing Contentions

Stevens also challenges the district court's upward adjustment of his offense level by two levels pursuant to Guidelines § 2D1.1(b)(1) for possession of a weapon,

and by two levels pursuant to Guidelines § 3C1.1 for obstruction of justice. Neither challenge requires extended discussion.

 Section 2D1.1(b)(1) of the Guidelines calls for a two-level enhancement "[i]f a dangerous weapon (including a firearm) was possessed" during the commission of a narcotics offense. This adjustment should normally be applied "unless it is clearly improbable that the weapon was connected with the offense." *Id.* Application Note 3. The defendant need not have had personal possession, or even actual knowledge of the weapon's presence; the enhancement is required "so long as the possession of the firearm was reasonably foreseeable to the defendant." *United States v. Soto,* 959 F.2d 1181, 1186 (2d Cir.1992). The sentencing court's finding that a firearm was possessed in connection with a drug offense for purposes of § 2D1.1 will not be overturned unless it is clearly erroneous. *See, e.g., id.* at 1186–87; *United States v. Pellegrini,* 929 F.2d 55, 56 (2d Cir.1991) (per curiam); *United States v. Rodriguez–Gonzalez,* 899 F.2d 177, 182–83 (2d Cir.), *cert. denied,* 498 U.S. 844, 111 S.Ct. 127, 112 L.Ed.2d 95 (1990).

 Stevens contends that there was insufficient evidence that he had knowledge of the gun's presence. This contention has no merit. The court found that "Stevens was part and parcel of people carrying it" during the attempted heroin sale "for the purposes of protection." (Tr. 12–13.) That finding is amply supported by the record, which included evidence that the gun was found in one of the vehicles in the caravan assembled at the scene of the aborted sale, and was within easy reach of its occupants. Guns are among the tools of the narcotics trade, *see, e.g., United States v. Torres,* 901 F.2d 205, 235 (2d Cir.), *cert. denied,* 498 U.S. 906, 111 S.Ct. 273, 112 L.Ed.2d 229 (1990); *United States v. Crespo,* 834 F.2d 267, 271 (2d Cir.1987), *cert. denied,* 485 U.S. 1007, 108 S.Ct. 1471, 99 L.Ed.2d 700 (1988), and Stevens had indicated that because he had never done business with Hilton before, he intended to take precautions. The court's conclusion that it was reasonably foreseeable to Ste-

vens that one or more of his coconspirators would bring a firearm to the transaction was not clearly erroneous.

 Finally, Stevens's contention that the upward adjustment for obstruction of justice on the basis that he perjured himself at trial is unconstitutional is meritless. "A defendant has no protected right to testify falsely." *United States v. Matos*, 907 F.2d 274, 276 (2d Cir.1990); *see also Harris v. New York*, 401 U.S. 222, 225, 91 S.Ct. 643, 645, 28 L.Ed.2d 1 (1971) ("Every criminal defendant is privileged to testify in his own defense, or to refuse to do so. But that privilege cannot be construed to include the right to commit perjury.")

### 6. On Remand

On remand, the court should first make the required findings as to the amount of heroin Stevens was capable of delivering and as to his role in the operation. Depending on the record and the court's findings, Stevens's base offense level may be 24 or 28; that level is then to be adjusted upward by three levels for Stevens's commission of the offense while on release, two levels for weapon possession, two levels for obstruction of justice, and at least two levels for his role in the offense; the court may add up to two more levels, in accordance with 3B1.1, if it finds by a preponderance of the evidence that Stevens was a manager, supervisor, organizer, or leader in the offense. The total offense level may thus be as low as 33 or as high as 39. The court may not depart upward on the ground that Stevens had not yet been sentenced for his Ring-related offense, though it is free to depart on such other basis as may be appropriate, explaining its reasons for departing and, if departing by more than one step, for the extent of the departure. The court must give Stevens an opportunity to show whether, or to what extent, he is financially unable to pay a fine.

In addition, since there is to be a remand, we note a few other sentencing matters that may need to be dealt with in connection with resentencing. First, if the defendant is to be sentenced within a Guidelines range that exceeds 24 months, the sentencing court is required to state its reasons for the period chosen within that range. 18 U.S.C. § 3553(c). The judge must articulate a reason that demonstrates that he " 'thoughtfully discharged his statutory obligation, with a degree of care appropriate to the severity of the punishment ultimately selected.' " *United States v. Lopez*, 937 F.2d 716, 725 (2d Cir.1991) (quoting *United States v. Chartier*, 933 F.2d 111, 117 (2d Cir.1991)). If the Guidelines range applied is the result of a departure, and the departure is accompanied by the required explanation of its extent, that explanation should suffice to satisfy § 3553(c); in the present case, however, we note that even without a departure any applicable Guidelines range would exceed 24 months, and the court's selection of a point within that range would require an explanation.

Second, the Sentencing Reform Act, which requires sentence enhancement for a defendant who committed the subject offense while on release, specifies that that enhancement—a maximum of ten years for a felony—"shall be consecutive to any other sentence of imprisonment." 18 U.S.C. § 3147. The Guidelines, in recognition of this requirement, provide that

> the court, in order to comply with the statute, should divide the sentence on the judgment form between the sentence attributable to the underlying offense and the sentence attributable to the enhancement. The court will have to ensure that the "total punishment" (*i.e.*, the sentence for the offense committed while on release plus the sentence enhancement under 18 U.S.C. § 3147) is in accord with the guideline range for the offense committed while on release, as adjusted by the enhancement in this section.

§ 2J1.7 Application Note 2; *see United States v. Wilson*, 966 F.2d 243, 248–49 (7th Cir.1992).

In the present case, the district court did not indicate what portion of Stevens's original prison term was attributable to the release-status enhancement and what portion was attributable to the underlying offense as otherwise adjusted and modified.

**1190**

On resentencing, the judgment should state what portion of the new sentence is attributable to the release-status enhancement and is thus to run consecutively to any other sentence of imprisonment.

Third, as to Stevens's term of supervised release, the Guidelines prescribed a range of four-to-five years. *See* 21 U.S.C. § 841(b)(1)(B); Guidelines § 5D1.2(a). The district court's imposition of a life term of supervised release thus represented a substantial departure, *see United States v. Marquez*, 941 F.2d at 64–65 (20–year term of supervised release represented departure where Guidelines prescribed three-to-five-year supervised release term), but was unexplained. Such a departure must be preceded by notice informing the defendant that the court is planning a departure of this type and must be accompanied by at least a brief statement of the reasons for the departure and its extent. *See generally id.*

Finally, we note that by the time Stevens is resentenced in the present case, he may well have been sentenced on his Ring-related offense, with full effect having been given in that proceeding to the sentence originally imposed here. If this has occurred, on remand Stevens should be resentenced nunc pro tunc, as of the time of the original sentence herein, with the Ring-related offense treated as if sentence were pending.

### CONCLUSION

We have considered all of Stevens's contentions on this appeal and have found them to have merit only as indicated above. The conviction is affirmed; the sentence is vacated and remanded for proceedings not inconsistent with the foregoing.