**UNITED STATES of America,
Appellee,**

v.

**A.J. THOMAS, Defendant–Appellant.**

**Docket Nos. 00–1393, 00–1394.**

United States Court of Appeals,
Second Circuit.

Argued: Nov. 27, 2000.

Decided: Feb. 1, 2001.

Bret A. Puscheck, Assistant United States Attorney, for Denise E. O'Donnell, United States Attorney, Western District of New York, Attorney for Appellee.

Robert G. Smith, Assistant Federal Defender, Western District of New York, Attorney for Defendant–Appellant.

Before VAN GRAAFEILAND and KATZMANN, Circuit Judges, and KAPLAN, District Judge.*

KAPLAN, District Judge.

The principal questions presented here are whether the government's failure to produce a transcript of testimony given by defendant in a prior administrative proceeding until after defendant completed his direct testimony violated Federal Rule of Criminal Procedure 16(a)(1)(A) and, if so, whether defendant was substantially prejudiced by the violation. We conclude that the answers to both questions are

* Honorable Lewis A. Kaplan, United States District Court for the Southern District of New York, sitting by designation.

affirmative and that the conviction therefore must be reversed. In view of the trial court's independent finding of a violation of the terms of defendant's supervised release, however, we affirm the judgment revoking supervised release and imposing an additional term of imprisonment.

## I

On April 20, 1999, a grand jury in the Western District of New York returned an indictment charging defendant with knowingly and unlawfully possessing eight rounds of ammunition on April 13, 1999, having previously been convicted of a felony.[1] In addition, the charge that formed the basis of the indictment was added to an amended petition for warrant or summons alleging that Thomas had violated the terms of his supervised release imposed as part of a sentence for a previous offense.[2] The defendant entered a plea of not guilty to the indictment on April 23, 1999, and the case was tried before the court and a jury on February 17, 18, 22, and 23, 2000.

The government's evidence portrayed the following sequence of events. Early in the evening of April 13, 1999, Thomas had a fight with Nikia Bratcher, the mother of one of his children, during which he allegedly struck her with a bottle. His niece, Ida Rivera, who was a friend of Bratcher, learned of the event and, accompanied by two sisters and a friend, started to drive to her grandmother's house to confront Thomas. After driving a short distance, Rivera heard a gunshot and noticed the defendant standing a few houses away. She sped off and flagged down police officers, who then located Thomas, chased him into his parents' house and there arrested him.

Two police officers testified that the defendant was wearing a large blue jacket as they chased him into his parents' house but acknowledged that defendant was not wearing a jacket by the time they entered the house and apprehended him. They did, however, find a blue jacket, which contained eight rounds of ammunition. One of the officers identified the jacket as the one the defendant had worn during the pursuit.[3]

During the three-day weekend between February 18, 2000, and February 22, 2000, the government obtained the transcript of a prior administrative proceeding[4] in which Thomas had made statements about the events leading to his arrest on April 13, 1999. The government, however, did not produce the transcript. It completed the presentation of its case on the morning of February 22 following which the court recessed for lunch.

On the afternoon of the 22nd, the defendant opened his case by calling Dolfrey Beckford, defendant's employer, who testified that he had discovered the coat in question at work and worn it after his own jacket became dirty, at which point he found ammunition at a junk yard and placed it in the pocket. The ammunition remained in the pocket when he later returned the coat to Thomas' mother, thinking that it belonged to Thomas.

Unaware that the government possessed the administrative transcript, Thomas took the stand later that afternoon. On direct examination, he denied any connection to

---

**1.** Defendant was convicted on May 1, 1997 in the United States District Court for the Western District of New York of being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g)(1). He was convicted on February 25, 1991 in Monroe County Court of burglary in the third degree in violation of N.Y. PENAL L. § 140.20 (McKinney 1988).

**2.** Defendant had been sentenced, *inter alia,* to a term of supervised release of three years on his 1997 felon in possession conviction, which term had not yet expired.

**3.** Following defendant's arrest, he allegedly told Rivera that he was sorry and that he thought "his baby's mother was in the car."

**4.** Defendant's mother had complained of police conduct to the Rochester Police Department Professional Standards Section. Defendant voluntarily testified in that matter.

the coat containing the ammunition. At the completion of his direct testimony, the court took a brief recess following which the government sought to confront Thomas on cross-examination with statements he had made during the administrative proceeding. Defense counsel objected to use of the transcript on the ground that the government should have produced it earlier pursuant to Rule 16. The court, however, overruled the objection, holding that the transcript was not within Rule 16 because it did not contain custodial statements of the defendant and the defendant had given the statement voluntarily. The government thereupon used the transcript to impeach Thomas on a number of points, most significantly on the question whether he had been wearing the blue coat in which the ammunition had been found when the police pursued him into his mother's house. The transcript was devastating on that critical issue, as Thomas had testified in the administrative hearing that, on entering the house in which he was arrested, "I took off my blue work coat with my name on it and sat it on the couch next to my black big jacket."

The jury returned a guilty verdict on February 23. Defendant subsequently moved for a new trial on the ground that the government had violated Rule 16 by its belated production of the transcript. The court, however, adhered to its prior ruling, reasoning that the transcript did not fit within Rule 16 because it was not used on the government's case in chief or as an admission and because the statements it contained were "generated by Mr. Thomas and his mother and actually bringing [*sic* ]

a proceeding or complaining about police conduct." It therefore denied the motion.

In a separate proceeding before the court on March 28, 2000, the court found, independently of the jury verdict but on the basis of the trial evidence, that Thomas had violated his supervised release by possessing the ammunition. Sentencing took place on May 19, 2000, both for the primary charge of possession of ammunition and for violation of supervised release.

## II

■ Federal Rule of Criminal Procedure 16(a)(1)(A) provides in pertinent part that the government, if so requested, must disclose to the defendant "any relevant written or recorded statements made by the defendant, or copies thereof, within the possession, custody, or control of the government, the existence of which is known, or by the exercise of due diligence may become known, to the attorney for the government."[5] The duty of disclosure continues throughout the trial, requiring the government to disclose material to the defense "promptly"—that is, as soon as the prosecutor becomes aware of it.[6]

As a record of statements made by Thomas that described the events leading up to his arrest on April 13, 1999, the transcript fell squarely within the coverage of Rule 16. The government's argument that the transcript was not Rule 16 material because Thomas' statements were not made in response to interrogation is without merit. As we held in *United States v. Matthews*, a case similar to the one before us, Rule 16 obliges the government to produce "any relevant written or recorded statements made by the defendant,"[7] giv-

---

**5.** Thomas made no formal request. The government, however, had produced Rule 16 material voluntarily and therefore does not dispute Thomas' entitlement to the transcript at issue, assuming that it otherwise was producible under Rule 16.

**6.** *See* Fed.R.Crim.P. 16(c) ("If, prior to or during trial, a party discovers additional evidence or material previously requested or ordered, which is subject to discovery or inspection

under this rule, such party shall promptly notify the other party or that other party's attorney or the court of the existence of the additional evidence or material."); *see also United States v. Matthews*, 20 F.3d 538, 550 (2d Cir.1994).

**7.** *Matthews*, 20 F.3d at 550 (quoting Fed. R.Crim.P. 16(a)(1)(A) (internal quotation marks omitted)).

ing a defendant " 'virtually an absolute right' to his own statements." [8] Indeed, we there ruled that a love letter written by the defendant—surely not the product of interrogation—was Rule 16 material.[9] In consequence, the facts that Thomas had given the statements in the administrative transcript voluntarily, that the statements were not custodial, and that the government did not use the statements on its case in chief all are immaterial. The trial court erred in holding that the government was not obliged by Rule 16(a)(1)(A) to produce Thomas' statements "promptly." [10]

### III

▉ Although the government violated Rule 16, a new trial is warranted only if appellant has shown "that the failure to disclose caused him substantial prejudice." [11] This assessment requires consideration of "the nature of the evidence sought, the extent to which it bore on critical issues in the case, the reason for its nonproduction, and the strength of the government's untainted proof" [12] as well as the timing of production.

Both the nature of the evidence and its significance to the case strongly support a conclusion of substantial prejudice. As the foregoing makes clear, the questions whether Thomas owned the blue coat and whether he wore it on the night in question were pivotal to the ultimate question whether Thomas knowingly possessed the ammunition. The transcript of the administrative proceeding thus bore on a critical issue in the case.[13] Moreover, the statement was a direct admission by the defendant himself on that central point. In-

deed, it is difficult to imagine evidence more important to this case than Thomas' admission in the administrative proceeding that he had been wearing a blue coat on the night in question.

The significance of the transcript, and of its belated production during the government's cross-examination of Thomas, was magnified by the relative weakness of the government's remaining proof. The coat was found in close proximity to Thomas at the time of the arrest, but Thomas' employer had provided an alternative and innocent explanation for that fact. Arresting police officers testified that a man wearing "a large blue jacket and blue jeans" was seen for about 25 seconds outside the house in which Thomas was arrested and identified Thomas as that individual, but the brevity of their opportunity for observation made their identifications somewhat debatable. Another officer testified merely that he saw a man in "dark clothes" outside the house.

Nor did the government offer a sufficient explanation for the failure to produce the transcript earlier. The best that can be said for it, as the prosecutor acknowledged during oral argument in this Court, is that counsel mistakenly believed that the transcript did not constitute Rule 16 material and therefore withheld it until following Thomas' direct testimony in order to take maximum advantage of it on cross-examination. We previously have noted that it is inappropriate, especially in a close case, to let the government benefit from what seems to be "a lack of candor

8. *United States v. Stevens*, 985 F.2d 1175, 1180 (2d Cir.1993) (quoting 2 Charles Alan Wright, Federal Practice and Procedure § 253 at 46 (1982)).

9. *See Matthews*, 20 F.3d at 550.

10. The government does not contend that it "promptly" produced the statements. Nor could it reasonably do so.

11. *Stevens*, 985 F.2d at 1181.

12. *Id.* (citing *United States v. Petito*, 671 F.2d 68, 74 (2d Cir.), cert. denied, 459 U.S. 824, 103 S.Ct. 56, 74 L.Ed.2d 60 (1982)).

13. The transcript also impeached Thomas' testimony by introducing contradictory statements about the vehicle Thomas drove immediately before his arrest and about how the police treated Thomas' father at the time of the arrest.

unworthy of a prosecutor." [14] It is equally inappropriate to allow the government to take advantage of its own misunderstanding of the scope, under clearly established law, of its discovery obligations.

The government nevertheless urges us to hold that introduction of the material occurred too late in the trial to have caused substantial prejudice because Thomas' counsel committed during his opening to calling Thomas as a witness. It relies on *Matthews*, where we affirmed a conviction despite a similar Rule 16 violation on the ground of lack of prejudice because the defense had "irretrievably committed itself" to the theory that was undermined by the evidence that belatedly was produced. [15]

This case is different. Defense counsel's statement in his opening that the defendant was likely to testify amounted neither to the presentation of a theory of the case nor to an irretrievable commitment. The decision whether to testify—not at issue in *Matthews*—is a key part of trial strategy, [16] which the delayed production adversely affected. [17] Indeed, notwithstanding the opening, it is extremely unlikely that any competent defense counsel who received the transcript before Thomas took the stand would have advised him to testify, given his admission in the transcript that he had been wearing a blue coat on the night in question. Nor are we prepared to assume that, had Thomas not testified, the jury would have ignored the instruction that then would have been obligatory— that Thomas had a constitutional right to remain silent and that the jury was to draw no inference from the fact that he did so. [18]

In all the circumstances, we are persuaded that Thomas has shown that he was prejudiced substantially with the jury by the government's failure to produce the transcript before Thomas took the stand. In all probability, he would not have testified had the transcript been disclosed promptly, and the government's remaining evidence was not so strong as to make prejudice unlikely. [19] Accordingly, although we are troubled by Thomas' own apparent lack of candor in his direct testimony, the conviction cannot stand and Thomas is entitled to a new trial. The government of course there will be free to make any appropriate use of the administrative transcript now that it has been turned over to Thomas.

## IV

■ After the conclusion of the trial, the district court held a separate proceeding to address whether Thomas had violated the terms of his supervised release. Acting as an independent fact finder, the judge considered the evidence in the record and found that Thomas had violated the terms of his supervised release. While the untainted evidence against Thomas was not overwhelming, this finding—which properly was made on the preponderance of the evidence standard [20]—was not clearly erroneous. Nor are we convinced that the effect of the transcript on the trial judge

14. *United States v. Baum*, 482 F.2d 1325, 1332 (2d Cir.1973).

15. *Matthews*, 20 F.3d at 550.

16. *Cf. United States v. Padrone*, 406 F.2d 560, 561 (2d Cir.1969) (per curiam) (noting, after the government failed to comply with a court order to produce defendant's statement, that "[h]ad defense counsel known the contents of the statement, he might well have advised Padrone not to take the stand").

17. *United States v. Adeniji*, 31 F.3d 58, 64 (2d Cir.1994) (noting that to show substantial prejudice "the defendant must demonstrate that the untimely disclosure of the statement adversely affected some aspect of his trial strategy").

18. 1 LEONARD B. SAND, MODERN FEDERAL JURY INSTRUCTIONS 5-21.

19. *See Stevens*, 985 F.2d at 1181.

20. *See* 18 U.S.C. § 3583(e)(3) (1988 & Supp. V); *Johnson v. United States*, 529 U.S. 694, 120 S.Ct. 1795, 1800, 146 L.Ed.2d 727 (2000).

was substantially prejudicial given the lower standard of proof. Accordingly, we decline to disturb his conclusion as to the supervised release violation.

V

The judgment revoking the term of supervised release is affirmed. The judgment of conviction is reversed and the case remanded for further proceedings consistent with this opinion.