**UNITED STATES of America,**
**Appellee,**

v.

**Rasheim CARLTON, Defendant–**
**Appellant.**

**Docket No. 05–0974–CR.**

United States Court of Appeals,
Second Circuit.

Argued Sept. 12, 2005.

Decided March 24, 2006.

---

Clinton W. Calhoun, III, Briccetti, Calhoun & Lawrence, LLP, White Plains, New York, for Defendant–Appellant.

Daniel S. Dorsky, Assistant United States Attorney, New York, New York (David N. Kelley, United States Attorney, Karl Metzner, Assistant United States Attorney, Southern District of New York, New York, New York, of counsel), for Appellee.

Before: CARDAMONE, CABRANES, and POOLER, Circuit Judges.

CARDAMONE, Circuit Judge:

Defendant Rasheim Carlton (defendant or appellant) appeals a February 22, 2005 judgment of the United States District Court for the Southern District of New York (Robinson, J.) revoking his term of supervised release imposed pursuant to 18 U.S.C. § 3583(e)(3) and sentencing him to a term of 35 months imprisonment and 25 months supervised release. Carlton contends that 18 U.S.C. § 3583(e)(3), which empowers a district court to revoke a term of supervised release without a jury trial, is invalid as applied to him because it violates his Sixth Amendment right to trial by jury as articulated by the Supreme Court in *United States v. Booker*, 543 U.S. 220, 125 S.Ct. 738, 160 L.Ed.2d 621 (2005), and its related cases. He further contends that the evidence presented at his revocation hearing was insufficient to convict him for violating the conditions of his supervised release. Because we reject Carlton's constitutional challenge, but conclude the evidence at his hearing was legally insufficient with respect to one of the findings of violation, we affirm in part, vacate in part, and remand for resentencing.

## BACKGROUND

For his role in several armed bank robberies and in drug trafficking a federal district court in 1998 sentenced Carlton to 150 months imprisonment, to be followed by five years supervised release, and ordered him to pay restitution in the amount of $114,806 and a special assessment of $800. Four years into his prison term, the district court amended its judgment and reduced Carlton's sentence to 78 months incarceration to be followed by five years supervised release. After completing this reduced term of imprisonment, defendant was released from custody on July 24, 2003 and began his five years of supervised release. Less than a year later Carlton committed another armed bank robbery. He and an accomplice, wearing hoods, masks, and gloves and brandishing a handgun, entered a Wachovia Bank in Ardsley, New York and robbed it on May 28, 2004. After seizing $42,000 in cash, the two robbers fled the scene of the crime in a gold-colored Mitsubishi.

A few days later federal authorities were approached by Keith Shaw, a self-described "street guy" and friend of Carlton's. Shaw, an individual with a lengthy criminal history, had been taken into custody by the White Plains, New York, Police Department as a result of an unrelated criminal charge. Hoping to gain the favor

of local authorities, Shaw volunteered information regarding Carlton's involvement in the Ardsley robbery. The White Plains police promptly relayed this information to the Federal Bureau of Investigation (FBI). FBI Special Agent Michael Harkins then met with Shaw, who told him that Carlton had committed the Ardsley robbery and was planning a similar crime in the near future.

The government enlisted Shaw's aid in conducting a full investigation into Carlton's involvement in the Ardsley robbery. In addition to placing him in a hotel temporarily for his safety, the government offered Shaw free drug counseling (which he did not accept) and gave him money for clothing, food, and permanent relocation expenses. The FBI did not offer Shaw assistance with the local charges pending against him, other than to inform the White Plains police of his cooperation in the investigation. Shaw for his part agreed to meet with Carlton while under government surveillance and while wearing a recording device. This effort resulted in two recorded conversations between Carlton and Shaw, one by telephone and the other in person. Before the investigation could develop further, the government, fearing the imminent commission of another bank robbery, filed a criminal complaint against Carlton seeking a warrant for his arrest. Defendant was subsequently apprehended and detained on June 4, 2004.

Rather than pursue criminal charges against Carlton for the Wachovia robbery, the government decided to prosecute him pursuant to 18 U.S.C. § 3583(e) for violating the conditions of his supervised release. The charging petition, which recommended revocation of supervised release, specified three violations: Specification 1 alleged commission of the Ardsley armed bank robbery on May 28, 2004 in violation of 18 U.S.C. § 2113; Specification 2 alleged conspiracy to commit a second bank robbery in violation of 18 U.S.C. § 371; and Specification 3 alleged conspiracy to possess with intent to distribute cocaine base in violation of 21 U.S.C. § 846. As permitted by the supervised release statute, a revocation hearing without a jury was held on July 21, 2004.

At the hearing the government relied primarily on Shaw's testimony. He testified that Carlton had approached him a week or two prior to the Ardsley bank robbery requesting his assistance, and that the night before its commission, after advising Shaw that the plan was "set," told him that he would be picked up the following morning to commit the crime. Shaw further testified that early in the morning of the robbery, May 28, 2004, Carlton left him a voicemail message asking for his whereabouts, to which Shaw did not respond because he had no intention of becoming involved in the crime. Shaw testified that he saw Carlton on the street at 10:30 a.m. later that morning, and that Carlton confirmed then that he and three accomplices had just robbed the Wachovia Bank.

Other evidence linking Carlton to the Ardsley robbery corroborated Shaw's testimony. This included a local police officer's testimony stating that he observed Carlton get out of a gold-colored Mitsubishi similar to the one used to flee the crime scene; security photographs of Carlton's female acquaintance wearing a wig inside the Wachovia Bank a week prior to the robbery; and Carlton's checking into an expensive hotel for five nights the night of the Ardsley robbery for the alleged purpose of laying low. The most damaging corroborative evidence was no doubt the recorded conversations between Shaw and Carlton, which were taped while Shaw was cooperating with the FBI and con-

tained statements by Carlton explicitly acknowledging his participation in the Ardsley crime.

The recorded conversations also provided the basis for the government's evidence with respect to the second specification, the conspiracy to commit an additional bank robbery. The prosecutor said in his closing statement at the district court

Turning to [Specification 2], which is the planned bank robbery. Again, from Mr. Carlton's own mouth, we have him discussing a planned bank robbery, which is, in essence—I think the best evidence comes from the [recorded] conversation about the Wachovia Bank robbery, where Mr. Carlton says, "$13,000," referring to Wachovia. He then says, "We get more than that 'cause there's just two of us," meaning when we do the next robbery, there's only going to be two of us.

Shaw corroborated this evidence by testifying that Carlton had approached him a few days after the Ardsley robbery to discuss "do[ing] another bank job."

Q. And you say that, a few days later on, he asked you about doing another bank robbery or doing a bank robbery with him?

A. Yes.

Q. All right. Did anything come of that?

A. No.

Q. Did he give you any details about what he wanted to do?

A. No, he didn't.

Q. Did you agree with him to do a bank robbery?

A. No. I told him I would think about it.

Q. Were you working with the government by that point?

A. Yes.

The government presented virtually no other evidence regarding the commission of the conspiracy to commit another bank robbery and specifically told the district court that Carlton's statement regarding this specification meant that "when we do the next robbery, there's only going to be two of us." It is not entirely clear from the record whether Carlton spoke with Shaw about committing a second bank robbery before or after Shaw contacted the government or at both times; but the government at oral argument conceded that Shaw was not a co-conspirator, making determination of this fact unnecessary for disposition of this appeal.

After presentation of the evidence and closing statements, the district court found Carlton guilty on Specifications 1 (commission of Ardsley robbery) and 2 (conspiracy to commit a second robbery), but not 3 (the drug charge), and sentenced him to 35 months imprisonment, to be followed by 25 months supervised release. Finding Shaw's testimony to be credible and corroborated by other evidence, the district court ruled that the government had proved by a preponderance of the evidence that Carlton had committed the Ardsley bank robbery and was guilty of a conspiracy to commit another bank robbery.

Carlton, who is currently serving his sentence, filed a timely notice of appeal challenging the district court's judgment with respect to the first two specifications. On August 3, 2005 he was separately indicted by a federal grand jury for the Ardsley bank robbery, for which if convicted he could be sentenced to another term of imprisonment and supervised release. From the judgment revoking his current term of supervised release, Carlton appeals.

## DISCUSSION

### A. *Constitutionality of 18 U.S.C. § 3583(e)(3)*

■ Carlton was sentenced pursuant to 18 U.S.C. § 3583(e)(3), which provides that

a court, after consideration of the relevant factors set forth in 18 U.S.C. § 3553, may "revoke a term of supervised release ... if the court ... finds by a preponderance of the evidence that the defendant violated a condition of supervised release." The first question presented is whether this provision of the statute violates Carlton's constitutional due process rights.

Appellant asserts that § 3583(e)(3) is invalid as applied to him because it empowers a district court to revoke his term of supervised release without a jury trial and based on findings that are not proved beyond a reasonable doubt, in violation of his constitutional rights under the Fifth and Sixth Amendments to the Constitution. He reasons that while the Supreme Court recently has sought to preserve the guarantee that the jury would act as circuit-breaker between an individual and the power of the government, the revocation procedure in § 3583(e)(3) subverts that goal by permitting circumvention of both his right to trial by jury and proof of his guilt beyond a reasonable doubt. Because, according to Carlton, such circumvention is analogous to the kind of circumvention that occurs in the context of determinate sentencing, which the Supreme Court held unconstitutional in *United States v. Booker*, 543 U.S. 220, 125 S.Ct. 738, 160 L.Ed.2d 621 (2005), and *Blakely v. Washington*, 542 U.S. 296, 124 S.Ct. 2531, 159 L.Ed.2d 403 (2004), Carlton urges that the underlying principles of those cases and their progenitor *Apprendi v. New Jersey*, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000), have cast doubt on the continued vitality of 18 U.S.C. § 3583(e)(3). In other words, for purposes of the Fifth and Sixth Amendments, he deems his bank robbery conviction made pursuant to § 3583(e)(3) indistinguishable from a bank robbery conviction obtained in the normal course of a criminal trial, and asserts that his concomitant constitutional rights ought to be the same.

■ As the following discussion points out, appellant's argument does not reflect the present state of the law in the context of a revocation of supervised release. It is settled law that the "full panoply of rights" due a defendant in a criminal prosecution does not apply to revocation hearings for parole, for probation, or for supervised release, all of which are virtually indistinguishable for purposes of due process analysis. *See Morrissey v. Brewer*, 408 U.S. 471, 480, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972) (parole revocation); *Gagnon v. Scarpelli*, 411 U.S. 778, 782, 93 S.Ct. 1756, 36 L.Ed.2d 656 (1973) (probation revocation); *United States v. Pelensky*, 129 F.3d 63, 68 (2d Cir.1997) (revocation of supervised release); *United States v. Jones*, 299 F.3d 103, 109 (2d Cir.2002) ("[T]he constitutional guarantees governing revocation of supervised release are identical to those applicable to revocation of parole or probation."). Because revocation proceedings generally have not been considered criminal prosecutions, they have not been subject to the procedural safeguards, including the rights to trial by jury and to accusations proved beyond a reasonable doubt, associated with a criminal trial. *See Pelensky*, 129 F.3d at 68; *United States v. Lettieri*, 910 F.2d 1067, 1068 (2d Cir.1990); *see also United States v. Knights*, 534 U.S. 112, 120, 122 S.Ct. 587, 151 L.Ed.2d 497 (2001); *Black v. Romano*, 471 U.S. 606, 613, 105 S.Ct. 2254, 85 L.Ed.2d 636 (1985); 18 U.S.C. § 3583.

Appellant invites us to revisit this settled area of the law in light of the principles underlying the Supreme Court's recent assault on determinate sentencing schemes in *Blakely* and *Booker*. The Supreme Court in *Blakely* reaffirmed its commitment to the rule of *Apprendi* that "any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt," *Ap-*

*prendi,* 530 U.S. at 490, 120 S.Ct. 2348, and held

> Our precedents make clear . . . that the "statutory maximum" for *Apprendi* purposes is the maximum sentence a judge may impose *solely on the basis of the facts reflected in the jury verdict or admitted by the defendant* . . . . In other words, the relevant "statutory maximum" is not the maximum sentence a judge may impose *after finding* additional facts, but the maximum he may impose *without* any additional findings. When a judge inflicts punishment that the jury's verdict alone does not allow, the jury has not found all the facts "which the law makes essential to the punishment," . . . and the judge exceeds his proper authority.

*Blakely,* 542 U.S. at 303–04, 124 S.Ct. 2531. That holding was applied in *Booker,* where the Supreme Court significantly altered the federal sentencing regime, essentially by making the federal sentencing guidelines advisory instead of mandatory. *Booker,* 543 U.S. at 264–65, 125 S.Ct. 738; *see United States v. Crosby,* 397 F.3d 103, 108–11 (2d Cir.2005).

Carlton argues that the *Apprendi* rule should be applied to his case; he asks us to construe "relevant statutory maximum" to include his supervised release term but not punishment for its violation, since the punishment—in this case incarceration— was based on additional factual findings made by a judge. That is to say, according to Carlton, the jury must find all facts which are essential to the punishment for his violation of supervised release.

We encountered a similar challenge to the supervised release procedure recently in *United States v. McNeil,* 415 F.3d 273 (2d Cir.2005), decided after briefs had been submitted in the present appeal. We there held that "supervised release remains unaffected by *Booker*" because sentences imposed pursuant to § 3583(e)(3)

are, and always have been, discretionary, whereas *Booker* and *Blakely* concerned mandatory sentencing schemes. *McNeil,* 415 F.3d at 276–77 (citing *United States v. Fleming,* 397 F.3d 95, 97–98, 101 (2d Cir. 2005)). "[N]ot inclined to extend the sweep of *Booker* and *Blakely* to an area of law that is up to now undisturbed," we found that the prior jurisprudence regarding the Sixth Amendment's application to revocation proceedings remained intact post *Booker,* and accordingly held that the right to jury trial was inapplicable to supervised release proceedings because they were not criminal prosecutions within the meaning of the Sixth Amendment. *Id.* at 277, 125 S.Ct. 738.

Our holding in *McNeil* was in accord with intimations by the Supreme Court regarding the validity of postrevocation regimes, *see id.* at 276; *Blakely,* 542 U.S. at 308–09, 124 S.Ct. 2531; *Booker,* 543 U.S. at 258, 125 S.Ct. 738 (noting in *dicta* that "[m]ost of the statute is perfectly valid," citing 18 U.S.C. § 3583); *Knights,* 534 U.S. at 120, 122 S.Ct. 587 (observing that in revocation proceedings, "the trial rights of a jury and proof beyond a reasonable doubt, among other things, do not apply," citing 18 U.S.C. § 3583(e)), as well as the holdings of other courts of appeals to reach this precise issue post *Booker, see, e.g., United States v. Hinson,* 429 F.3d 114, 118–19 (5th Cir.2005); *United States v. Work,* 409 F.3d 484, 491–92 (1st Cir. 2005); *United States v. Coleman,* 404 F.3d 1103, 1104–05 (8th Cir.2005).

Despite these assurances of the statute's constitutionality, however, we are aware that some tension exists between § 3583(e)(3) and *Booker* and its related cases. *See McNeil,* 415 F.3d at 276–77. The tension arises because of the unusual nature of a sentence imposed pursuant to § 3583(e)(3)—a sentence which is "partly based on new conduct" yet authorized by

the underlying conduct and conviction. *See McNeil,* 415 F.3d at 277; *see also Johnson v. United States,* 529 U.S. 694, 712, 120 S.Ct. 1795, 146 L.Ed.2d 727 (2000) (noting that 18 U.S.C. § 3583(e)(3) "limits the possible prison term" that follows a violation of the conditions of supervised release "to the duration of the term of supervised release originally imposed" and "according to the gravity of the original offense").

If the acts that constitute a violation are also criminal in their own right and may serve as the basis for a separate prosecution, as in this case where Carlton has now been indicted by a federal grand jury, double jeopardy concerns would arise "if the revocation of supervised release were also punishment for the same offense." *Johnson,* 529 U.S. at 700, 120 S.Ct. 1795. The double jeopardy problem is avoided by "[t]reating postrevocation sanctions as part of the penalty for the initial offense." *See id.* at 700–01, 120 S.Ct. 1795; *United States v. Pettus,* 303 F.3d 480, 487 (2d Cir.2002) ("[A] violation of the conditions of supervised release does not constitute a new crime and the revocation of supervised release is not properly considered a new punishment.").

In the Sixth Amendment context, however, the tension still exists, as we cannot fully attribute the penalty imposed at a revocation hearing to the original conviction. In the present case, for example, the fact that Carlton violated his supervised release was found by a judge and not the original jury. In that sense, the facts reflected in the jury verdict for Carlton's underlying offense could not possibly include those that formed the basis for his sentence for violating supervised release; a jury cannot find facts "which the law makes essential to the punishment," *Blakely,* 542 U.S. at 304, 124 S.Ct. 2531, if those facts have not yet occurred. Carlton

asserts doing so violates the *Apprendi* rule.

The answer to Carlton's argument—and the reason his punishment pursuant to § 3583(e)(3) is qualitatively different from a bank robbery conviction obtained in the normal course of a criminal trial—is that a sentence of supervised release by its terms involves a surrender of certain constitutional rights and this includes surrender of the due process rights articulated in *Apprendi* and its progeny. The full panoply of procedural safeguards does not attach to revocation proceedings because the Supreme Court has "distinguished revocation proceedings from criminal prosecutions on the ground that a probationer *already stands convicted of a crime.*" *United States v. Brown,* 899 F.2d 189, 192 (2d Cir.1990) (emphasis added).

Consequently, it is evident that the constitutional rights afforded a defendant subject to revocation of supervised release for violation of its conditions are not co-extensive with those enjoyed by a suspect to whom the presumption of innocence attaches. Given a prior conviction and the proper imposition of conditions on the term of supervised release, when a defendant fails to abide by those conditions the government is not then put to the burden of an adversarial criminal trial. Instead, there is, as in this case, a revocation of release hearing at which, as the Supreme Court instructs, neither the right to a jury trial, nor proof beyond a reasonable doubt is required. As the Supreme Court has explained in the context of parole, *cf. Johnson,* 529 U.S. at 710–11, 120 S.Ct. 1795 (noting "similarity" between supervised release and parole, citing *United States v. Meeks,* 25 F.3d 1117, 1121 (2d Cir.1994)), such proceedings "arise[ ] after the end of the criminal prosecution, including imposition of sentence.... Revocation deprives an individual, not of the absolute

liberty to which every citizen is entitled, but only of the conditional liberty properly dependent on observance of special parole restrictions," *Gagnon*, 411 U.S. at 781, 93 S.Ct. 1756 (quoting *Morrissey*, 408 U.S. at 480, 92 S.Ct. 2593); *see also Knights*, 534 U.S. at 119, 122 S.Ct. 587 ("Inherent in the very nature of probation is that probationers do not enjoy the absolute liberty to which every citizen is entitled."); *United States v. Cranley*, 350 F.3d 617, 621 (7th Cir.2003) (noting that "it has long been understood that a fundamental and unchallenged condition of probation is that the probationer surrender his right to trial by jury should the government seek revocation, and thus imprisonment").

With regard to supervised release, this "conditional liberty" may include, *inter alia*, a prohibition against possession of pornographic matter, *United States v. Cabot*, 325 F.3d 384, 385 (2d Cir.2003); confinement to one's own home, *United States v. Kremer*, 280 F.3d 219, 221 (2d Cir.2002); submission to DNA sample collection, *United States v. Sczubelek*, 402 F.3d 175, 184 (3d Cir.2005); and even abstaining from alcohol, *United States v. Wesley*, 81 F.3d 482, 484 (4th Cir.1996)— not to mention "any other condition [the court] considers to be appropriate," within limitations not relevant here, 18 U.S.C. § 3583(d); *see id.* § 3563(b). There is no reason why the conditions of supervised release, which uncontroversially deprive the convicted of *substantive* constitutional rights, cannot also deprive the defendant of certain *procedural* constitutional rights for a specified term and under specific circumstances. In other words, it is of no constitutional concern that the conditions placed on a defendant's liberty in supervised release encompass by implication the additional condition expressed in § 3583(e)(3): that the defendant surrender his rights to trial by jury and to having accusations against him proved beyond a reasonable doubt.

Thus, in contrast to the defendants in *Apprendi, Blakely*, and *Booker*, Carlton stands already convicted of the underlying offense, and any rights he might have had as described in those cases have been pared down to "conditional liberty," the existence of which depends on defendant's observing the limitations of his supervised release. For these reasons, we must reject appellant's constitutional challenge to 18 U.S.C. § 3583(e)(3).

## B. *Sufficiency of the Evidence*

■ Carlton also challenges the evidence presented at his hearing on the grounds that it was insufficient to support his convictions on Specifications 1 and 2. As to Specification 1, the commission of the Ardsley robbery, he avers the district court erred by applying the preponderance standard to its findings; by giving credence to Shaw's testimony despite his "mind-boggling" criminal record; and by overstating the evidence corroborating Shaw's testimony. As to Specification 2, the conspiracy to commit a second bank robbery, Carlton maintains that, under any standard of proof, there was insufficient evidence to sustain a conspiracy finding because the requisite element of criminal agreement was lacking. That is to say, by presenting only evidence implicating Shaw and Carlton, the government failed to establish a conspiracy because Shaw, as a government informant, could not have formed the requisite criminal agreement with Carlton. We may dispense with these issues rather quickly, noting that we review a district court's finding of a violation of supervised release only for an abuse of discretion and its factual findings for clear error. *See United States v. Marshall*, 371 F.3d 42, 45 (2d Cir.2004); *United States v. Thomas*, 239 F.3d 163, 168 (2d Cir.2001).

■ 1. *Commission of the Ardsley Bank Robbery.* Carlton's challenge to the proof in Specification 1 is without merit. First, as discussed above, accusations proved by a preponderance of evidence do not violate the Fifth or Sixth Amendments in the context of supervised release. Moreover, the district court acted pursuant to its statutory authority in "find[ing] by a preponderance of the evidence that the defendant violated a condition of supervised release," 18 U.S.C. § 3583(e)(3), and hence committed no error by applying that standard.

■ Second, the trial court did not err by crediting Shaw's testimony despite his lengthy criminal history. We accord strong deference to a district court's credibility determinations, particularly where that court based its findings on such determinations. *United States v. John Doe # 1*, 272 F.3d 116, 124 (2d Cir.2001). Here, Shaw's lengthy criminal history consisted mainly of misdemeanor convictions which the trial court apparently found of not much concern for credibility purposes. The court was entitled to do so because the government is often saddled with imperfect witnesses, and the finder of fact must evaluate their testimony despite the witnesses' shortcomings. *United States v. Schneider*, 395 F.3d 78, 87 (2d Cir.2005).

Third, the trial court was similarly entitled to deference in its finding that the other evidence—particularly Carlton's recorded conversation explicitly acknowledging his participation in the Ardsley robbery—corroborated Shaw's testimony, and appellant's attempt to disparage that court's reasoning in this regard is unpersuasive. Our own review of the record leads us to agree that the evidence was compelling. In short, there is no colorable claim of insufficient evidence with regard to Specification 1.

■ 2. *Conspiracy to Commit Another Bank Robbery.* We turn now to Specification 2, the conspiracy to commit an additional bank robbery. To convict a defendant of such a conspiracy, the government must prove, among other things, "that the person charged with conspiracy ... knowingly joined and participated in it. ... The agreement between the party charged and his co-conspirators is the gist of the crime of conspiracy." *United States v. Jones*, 393 F.3d 107, 111 (2d Cir.2004). The agreement to conspire requires that at least two culpable co-conspirators agree, and a "person who enters into such an agreement while acting as an agent of the government, either directly or as a confidential informant, lacks the criminal intent necessary to render him a *bona fide* co-conspirator." *United States v. Vazquez*, 113 F.3d 383, 387 (2d Cir.1997).

The government conceded at oral argument that the requisite agreement was not formed between Carlton and Shaw. Instead, it proposed an altogether novel theory—one it did not propose to the district court—that the agreement occurred between unnamed and unknown co-conspirators other than Shaw. The government's brief cites as support for this argument the fact that Carlton approached Shaw with a proposed additional robbery, was captured on tape making reference to the planned robbery, and had just finished successfully completing the Ardsley robbery with three other individuals. At oral argument and despite repeated requests from the panel to marshal the facts for the specification, the government provided no additional support. Essentially, it declared that the district court must have inferred a conspiracy with unknown others because it could not have inferred a conspiracy with Shaw.

We find this argument unpersuasive based on the record before us. To begin with, to reason that the district court must have inferred a conspiracy with unspecified co-conspirators because it could not,

consistent with the law, have found a conspiracy with Shaw, is to presume that the district court was in some way correct with regard to the conspiracy charge—*i.e.*, that its finding was somehow supported by sufficient evidence. That of course is the question squarely before this Court, and to assume its answer is inappropriate. Further, the district court did not cite any specific evidence—nor do we discern any from the present record—to support the inference that Carlton's use of accomplices in conducting past bank robberies necessarily implies his use of co-conspirators in future robberies. In fact, the "best evidence" for tending to show the existence of the conspiracy, according to the government's own lawyer, suggests precisely the opposite.

> I think the best evidence comes from the [recorded] conversation about the Wachovia Bank robbery, where Mr. Carlton says, "$13,000," referring to Wachovia. He then says, "We get more than that 'cause there's just two of us," meaning when we do the next robbery, there's only going to be two of us.

Indeed, this statement by the government attorney may be construed as an implicit admission that the evidence on the second specification is legally deficient. Finally, not only did the government make clear to the district court that the sole potential co-conspirator was Shaw and fail to present any evidence otherwise; but also it raised its novel theory regarding unspecified co-conspirators for the first time on appeal, developing this theory only at oral argument before us. It is noteworthy that the federal grand jury's indictment against Carlton charging him for the Ardsley robbery (which came down after completion of Carlton's revocation hearing) does not charge him with a *conspiracy* to commit an additional bank robbery.

In sum, the present record does not support the district court's finding that appellant violated the terms of his super-

vised release by engaging in a conspiracy to commit an additional bank robbery. We must therefore vacate the district court's finding with respect to Specification 2 and remand for further proceedings.

## CONCLUSION

For the foregoing reasons, the judgment of the district court is affirmed on Specification 1, vacated on Specification 2, and remanded for resentencing and further proceedings consistent with this opinion.