**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 18-4913

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

v.

DANIEL KA, a/k/a Daniel Konso,

Defendant - Appellant.

Appeal from the United States District Court for the Western District of North Carolina, at Charlotte. Frank D. Whitney, District Judge.  (3:10-cr-00144-FDW-DSC-1)

Argued: September 9, 2020                                 Decided: December 2, 2020

Before GREGORY, Chief Circuit Judge, and WYNN and HARRIS, Circuit Judges.

Affirmed by published opinion. Judge Wynn wrote the majority opinion, in which Judge Harris joined. Chief Judge Gregory wrote a dissenting opinion.

**ARGUED:**  Melissa S. Baldwin, FEDERAL DEFENDERS OF WESTERN NORTH CAROLINA, INC., Charlotte, North Carolina, for Appellant.  Anthony Joseph Enright, OFFICE OF THE UNITED STATES ATTORNEY, Charlotte, North Carolina, for Appellee.  **ON BRIEF:**  Anthony Martinez, Federal Public Defender, FEDERAL DEFENDERS OF WESTERN NORTH CAROLINA, INC., Charlotte, North Carolina, for Appellant.  R. Andrew Murray, United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Charlotte, North Carolina, for Appellee.

WYNN, Circuit Judge:

While serving a term of supervised release, Defendant Daniel Ka made several self-incriminating statements to his probation officer. The United States District Court for the Western District of North Carolina considered these statements when it found Ka guilty of violating the terms of his supervision and revoked his supervised release.

On appeal, Ka contends that the district court violated his Fifth Amendment right against self-incrimination by denying his motion to suppress these statements. Because we have previously held that the use of compelled, self-incriminating statements in a supervised release revocation hearing does not violate the Self-Incrimination Clause of the Fifth Amendment, we affirm the district court's denial of Ka's motion to suppress.

I.

In 2011, Ka was convicted of possessing a firearm during and in relation to a drug trafficking crime. The district court's sentence of five years of imprisonment was followed by five years of supervised release which he began serving in June of 2016. The conditions of Ka's supervised release required him to refrain from committing any new crime or using controlled substances and to "answer truthfully all inquiries by [his] probation officer and [to] follow the instructions of [his] probation officer." J.A. 15.[1] Additionally, Ka's criminal judgment provided that "[u]pon a finding of a violation of probation or supervised release . . . the court may (1) revoke supervision, (2) extend the term of supervision, and/or (3) modify the conditions of supervision." *Id.* at 18.

---

[1] Citations to "J.A. __" refer to the Joint Appendix filed by the parties in this appeal.

Ka's trouble complying with the conditions of his release began approximately a year after he left prison. On May 26, 2017, he tested positive for drug use. His probation officer, Chelsey Padilla, warned him that any further positive tests would result in fifteen days of confinement. Accordingly, after Ka again tested positive two months later, the district court ordered him to serve fifteen days in the Gaston County Jail. Not long after his release from the county jail, Ka recorded a third positive drug test. In response, Officer Padilla and her partner traveled to Ka's house to discuss his drug use.

The officers spoke with Ka as the three sat around his dining room table. During their conversation, Ka told Officer Padilla that he was short on cash after leaving the county jail and that he had been helping friends sell drugs to make money. Officer Padilla reviewed text messages on Ka's phone, finding photos of marijuana and text messages related to drug sales. Ka then signed a statement prepared by Officer Padilla in which Ka admitted to selling marijuana and cocaine. The statement also included Ka's averment that "[t]hese are my own words and [are] given voluntarily." *Id.* at 156. At no point during the conversation did Ka invoke his Fifth Amendment right against self-incrimination.

Following her conversation with Ka, Officer Padilla petitioned the district court to revoke Ka's term of supervised release pursuant to 18 U.S.C. § 3583(e) because, as relevant on appeal, Ka had violated the condition of his supervision prohibiting him from breaking the law.

Ka moved to suppress all statements he had made to Officer Padilla concerning his possession and sale of drugs on the grounds that the use of these statements violated his

Fifth Amendment privilege against self-incrimination. While conceding that he never invoked the privilege, Ka argued that the Fifth Amendment's "penalty exception" applied.

A defendant generally "must assert the [Fifth Amendment's privilege against self-incrimination] rather than answer [a law enforcement officer's questions] if he desires not to incriminate himself." *Minnesota v. Murphy*, 465 U.S. 420, 429 (1984). However, this general rule does not apply in "penalty" cases, "in which assertion of the privilege results in a penalty that essentially 'foreclose[s] a free choice to remain silent.'" *United States v. Lara*, 850 F.3d 686, 692 (4th Cir. 2017) (alteration in original) (quoting *Garner v. United States*, 424 U.S. 648, 661 (1976)). Ka argued that the condition in his terms of supervision requiring him to "answer truthfully all inquiries by the probation officer and follow the instructions of the probation officer" meant he would have been penalized for any assertion of his Fifth Amendment privilege, rendering the privilege self-executing under the penalty exception.

The magistrate judge recommended denying Ka's motion to suppress. The district court accepted the recommendation, denied Ka's motion, and later sentenced Ka to thirty months of imprisonment and an additional term of twenty-four months of supervised release for violating the conditions of his supervision. In so doing, the district court relied in part on Ka's statements to Officer Padilla. Ka filed a timely appeal.

II.

On appeal, Ka argues that the district court violated the Fifth Amendment by considering his statements to Officer Padilla. "[W]e review de novo the issue whether the

4

government violated a defendant's Fifth Amendment right against compelled self-incrimination." *Lara*, 850 F.3d at 690.

We need not decide whether the condition of Ka's release requiring him to answer truthfully all inquiries by his probation officer triggered the Fifth Amendment's penalty exception because, even if it did, our recent holding in *United States v. Riley* precludes Ka's challenge. In *Riley*, we concluded that the Self-Incrimination Clause of the Fifth Amendment does not prevent the use of compelled, self-incriminating statements in supervised release revocation hearings held, as Ka's was, under 18 U.S.C. § 3583(e). *See* 920 F.3d 200, 207–09 (4th Cir. 2019).

The Self-Incrimination Clause provides that no person "shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. In *Riley*, we explained that the clause is violated "*only* if [the self-incriminating] statements are used in a criminal trial." 920 F.3d at 205. "Supervised release revocation proceedings, however, are *not* part of the underlying criminal prosecution." *Id.* Thus, the introduction of compelled self-incriminating statements in supervised release revocation proceedings does not violate a defendant's rights under the Self-Incrimination Clause. *Id.* at 209. The district court did not err by relying on Ka's statements to Officer Padilla in his supervised release revocation hearing.

Ka argues that the Supreme Court's recent decision in *United States v. Haymond* fatally undermines our holding in *Riley*. *United States v. Haymond*, 139 S. Ct. 2369 (2019). We disagree.

The defendant in *Riley*, like Ka, was sentenced under the ordinary supervised release revocation provision, 18 U.S.C. § 3583(e)(3). *See Riley*, 920 F.3d at 209; S.J.A. 174. By contrast, *Haymond* involved an as-applied constitutional challenge to 18 U.S.C. § 3583(k), an "unusual provision" that imposed a mandatory minimum sentence of five years' imprisonment if a supervised releasee committed one of several enumerated offenses— "without empaneling a jury of his peers or requiring the government to prove his guilt beyond a reasonable doubt." *Haymond*, 139 S. Ct. at 2373–74, 2383 (plurality opinion). The Court concluded that the statute was unconstitutional under the Fifth Amendment's Due Process Clause and the Sixth Amendment's jury guarantee. *Id.* at 2378. But the plurality was careful to cabin its analysis to § 3583(k). *See id.* at 2382–83 & n.7 ("[W]e do not pass judgment one way or the other on § 3583(e)'s consistency with *Apprendi*[ *v. New Jersey*, 530 U.S. 466 (2000)]. . . . [O]ur decision is limited to § 3583(k).").

Moreover, in his controlling concurrence,[2] Justice Breyer highlighted three unique aspects of § 3583(k) that distinguish it from § 3583(e): (1) § 3583(k) applies only to an enumerated list of federal criminal statutes; (2) it strips judges of the discretion to decide whether a violation of a condition of supervised release should result in imprisonment; and (3) it "limits the judge's discretion in a particular manner: by imposing a mandatory minimum term of imprisonment of [five years]" upon the judge's finding that the releasee had committed one of the enumerated offenses. *Id.* at 2386 (Breyer, J., concurring). "Taken

---

[2] "Justice Breyer's concurrence [in *Haymond*] presented the narrowest grounds for the Court's holding and therefore controls." *United States v. Coston*, 964 F.3d 289, 295 (4th Cir. 2020).

together," these features made § 3583(k) "resemble the punishment of new criminal offenses," and so triggered the jury right "that attend[s] a new criminal prosecution." *Id.* Section 3583(k) did not grant releasees that jury right, so, Justice Breyer concluded, it was unconstitutional. *Id.* Notably, however, § 3583(e) "does not contain any of the three features that, in combination, render[ed] § 3583(k) unconstitutional." *United States v. Doka*, 955 F.3d 290, 296 (2d Cir. 2020).

Because the controlling opinion in *Haymond* relied on the unique aspects of § 3583(k) not present in § 3583(e), *Haymond* did not abrogate *Riley*. Our sister circuits that have considered whether *Haymond* has implications for their § 3583(e) jurisprudence agree that it does not. *Id.* at 292 (concluding that "*Haymond* did not undermine, let alone overrule" Second Circuit precedent on the constitutionality of § 3583(e)); *see also United States v. Walton*, 819 F. App'x 731, 734 (11th Cir. 2020) (unpublished) (per curiam) (concluding that *Haymond*'s holding was limited to § 3583(k) and therefore "d[id] not overrule or abrogate [circuit precedent] regarding the constitutionality of § 3583(e)"); *United States v. Smithey*, 790 F. App'x 643, 643–44 (5th Cir. 2020) (unpublished) (per curiam) (concluding that a revocation of supervised release pursuant to § 3583(e) did not contravene *Haymond* as that opinion was expressly limited to § 3583(k)). And our unpublished authority is similarly in accord, albeit in a case regarding the standard of proof during revocation proceedings, not the Self-Incrimination Clause. *See United States v. Mooney*, 776 F. App'x 171, 171 n.* (4th Cir. 2019) (unpublished) (per curiam) (concluding that "*Haymond* had no impact on [defendant's] run-of-the-mill revocation sentence imposed under 18 U.S.C. § 3583(e)(3)"). *Riley* remains governing law and requires the

7

conclusion that Ka's Fifth Amendment right against compelled self-incrimination did not attach in his supervised release revocation hearing conducted pursuant to § 3583(e).

## III.

Because we previously held in *Riley* that the Self-Incrimination Clause of the Fifth Amendment does not apply in supervised release revocation hearings conducted pursuant to § 3583(e), and because that holding remains good law, the district court did not err in denying Ka's motion to suppress and considering his incriminating statements.

*AFFIRMED*

GREGORY, Circuit Judge, dissenting:

The majority concludes that *United States v. Riley* controls this case, such that even compelled self-incriminating statements may be used against defendants in supervised release revocation proceedings. Because in my view *Riley* cannot serve as binding precedent after the Supreme Court's decision in *United States v. Haymond*, I respectfully dissent.

I.

*Riley* considered a sentence arising under the general supervised release revocation provision, 18 U.S.C. § 3583(e)(3). *United States v. Riley*, 920 F.3d 200, 203–04, 209 (4th Cir. 2019). This Court held that supervised release revocation proceedings are not part of the "criminal prosecution," and therefore use of the defendant's self-incriminating statements could not constitute a Fifth Amendment violation. *Id.* at 204–05. In *Haymond*, the Supreme Court held that a more "unusual provision" governing supervised release revocation, 18 U.S.C. § 3583(k), was unconstitutional under the Fifth and Sixth Amendments. *United States v. Haymond*, 139 S. Ct. 2369, 2375–79, 2383 (2019) (plurality opinion); *id.* at 2385–86 (Breyer, J., concurring).

Here, the majority concludes that *Haymond* did not abrogate *Riley*. *Haymond* considered only revocation proceedings subject to § 3583(k), whereas the proceeding in *Riley* arose under § 3583(e). *See* Maj. Op. at 6–8. First, the majority points to *Haymond*'s express limitations, like the plurality's qualifiers that it "d[id] not pass judgment one way or the other on § 3583(e)'s consistency with *Apprendi*" and that its decision was "limited

9

to § 3583(k)." *Haymond*, 139 S. Ct. at 2382–83 & n.7 (plurality opinion); Maj. Op. at 6. Next, the majority emphasizes that Justice Breyer—in his controlling concurrence— identified "unique aspects of § 3583(k) that distinguish it from § 3583(e)." *Haymond*, 139 S. Ct. at 2386 (Breyer, J., concurring); Maj. Op. at 6–7. It was these aspects that made revocation proceedings under § 3583(k), in particular, more like a criminal prosecution, such that the Fifth and Sixth Amendments applied. Maj. Op. at 6–7. Because § 3583(e) lacks these features, the majority concludes that *Riley* remains good law.

The majority's reasoning goes to whether *Haymond* controls *the outcome* of constitutional challenges to revocation proceedings arising under § 3583(e)—like the one at issue in *Riley* or the one Mr. Ka raises here. But Mr. Ka does not argue that *Haymond* necessarily binds this Court to decide his Fifth Amendment challenge one way or the other.

Rather, Mr. Ka argues that *Haymond* undermined the necessary premises of *Riley*, such that *Riley* can no longer be given binding effect. *See, e.g.*, *United States v. Peterson*, 629 F.3d 432, 438 (4th Cir. 2011) (finding a circuit precedent non-binding where a Supreme Court holding "overruled at least in part *the reasoning* of" the prior decision) (emphasis added); *see also In re Guo*, 965 F.3d 96, 105 (2d Cir. 2020) (explaining that a prior panel decision is no longer binding after a Supreme Court decision either "broke the link on which we premised" the prior decision "or undermined an assumption of that decision," even if the Supreme Court did not "address the precise issue decided by the panel") (internal quotations omitted). Therefore, Mr. Ka contends, *Riley* does not control the outcome of this case, and this Court should consider anew the question of Fifth Amendment protections at supervised release revocation proceedings post-*Haymond*.

10

A.

The *Riley* court, like the majority here, declined to reach the defendant's compelled-statement argument because "[e]ven with regard to statements made under circumstances that would otherwise be viewed as coercive, the Self-Incrimination Clause is violated *only* if those statements are used in a criminal trial," and supervised release revocation proceedings "are *not* part of the underlying criminal prosecution." 920 F.3d at 205.

To support this conclusion, *Riley* cited Supreme Court decisions reaching the same conclusion as to probation and parole revocation proceedings. *See id.* at 205–06 (citing *Minnesota v. Murphy*, 465 U.S. 420, 429 (1984); *Morrissey v. Brewer*, 408 U.S. 471, 480 (1972)). *Riley* relied on the common presumption that the "[probation and parole] analysis is *equally applicable* to supervised release proceedings, which[] . . . are analogous to and largely indistinguishable from probation and parole proceedings."[1] *Id.* at 206 (emphasis added); *see also id.* (explaining that supervised release revocation proceedings are analogous to those of parole because, in both settings, the "full panoply of constitutional protections afforded a criminal defendant is not available") (quoting *United States v. Armstrong*, 187 F.3d 392, 394 (4th Cir. 1999)). In other words, the holding that the majority cites as controlling this case—that supervised release revocation proceedings are

[1] Other pre-*Haymond* decisions of this Court relied on similar reasoning, citing the Supreme Court's parole and probation jurisprudence based on the presumption that supervised release revocation proceedings are constitutionally equivalent. *See, e.g.*, *United States v. Ward*, 770 F.3d 1090, 1097 (4th Cir. 2014); *United States v. Ferguson*, 752 F.3d 613, 616 (4th Cir. 2014).

not part of the criminal prosecution—arose directly from the *Riley* court's determination that constitutional protections in supervised release revocation proceedings are coextensive with those of parole and probation. *See id.* at 205–06.

In *Haymond*, the Supreme Court controverted this premise for the first time. *Cf.* Jacob Schuman, *Supervised Release Is Not Parole*, 53 Loy. L.A. L. Rev. 587, 590 (2020) ("*Haymond* is the Supreme Court's first major decision on the constitutional law of supervised release."). *Haymond* held that imposing a mandatory revocation sentence under § 3583(k) based on the district court's factfinding on a preponderance of the evidence standard violated the Fifth and Sixth Amendments. 139 S. Ct. at 2376–85 (plurality opinion); *id.* at 2385–86 (Breyer, J., concurring).

The plurality found that these protections could apply because "a 'criminal prosecution' continues . . . until a final sentence is imposed," and "an accused's final sentence includes any supervised release sentence he may receive." *Id.* at 2379–80 (plurality opinion) (citing *Johnson v. United States*, 529 U.S. 694, 700 (2000)). "The defendant receives a term of supervised release thanks to his initial offense, and whether that release is later revoked or sustained, it constitutes a part of the final sentence for his crime." *Id.* at 2380. Therefore, in the context of a challenge to § 3583(k), the plurality concluded that "[a]s at the initial sentencing hearing, . . . a jury must find any facts that trigger a *new* mandatory minimum prison term." *Id.* And in reaching this conclusion, the plurality identified "structural difference[s]" between supervised release and parole and probation that "bear[] constitutional consequences." *See id.* at 2381–82.

12

I agree with the majority that Justice Breyer's controlling concurrence is narrower than the plurality opinion. *See, e.g.*, *id.* at 2385 (Breyer, J., concurring) ("I agree with much of the dissent, . . ."). However, Justice Breyer also found that § 3583(k) "is unconstitutional," specifically because "[r]evocation of supervised release is typically understood as 'part of the penalty for the initial offense,'" and "[§] 3583(k) is difficult to reconcile with this understanding of supervised release." *Id.* at 2386 (quoting *Johnson*, 529 U.S. at 700). Thus, while Justice Breyer disagreed with the plurality on the *extent* to which the Court's Fifth and Sixth Amendment jurisprudence should apply to supervised release revocations more broadly, he agreed that constitutional protections *can* attach. *Haymond*, 139 S. Ct. at 2385–86 (Breyer, J., concurring). Ultimately, then, *Haymond* held that a supervised release revocation could be part of a criminal prosecution, whereas under *Murphy* and *Morrissey*—the cases *Riley* relied upon—parole and probation revocations cannot be.

After *Haymond*, *Riley*'s broad rule statement that "[s]upervised release revocation proceedings . . . are *not* part of the underlying criminal prosecution" is incorrect. *See Riley*, 920 F.3d at 205. Instead, it is now possible for them to be "part of the underlying criminal prosecution" based on unique features of the supervised release system. It is no longer true, as a general rule, that "as with parole revocation proceedings, the full panoply of constitutional protections afforded a criminal defendant is not available in supervised release revocation proceedings." *See id.* at 206 (internal quotations omitted). And it can no longer be taken as a given that the Supreme Court's parole and probation jurisprudence

13

is "equally applicable" in the supervised release context because the systems are constitutionally "indistinguishable." *See id.*

Therefore, *Haymond* undermined *Riley*'s presumption of coextensive constitutional protections across the supervised release, parole, and probation contexts. Rather, supervised release's differences from parole and probation bear constitutional consequences. *Haymond*, 139 S. Ct. at 2382. For these reasons, I would find that *Riley* does not bind this panel. *See Peterson*, 629 F.3d at 438; *In re Guo*, 965 F.3d at 105. Instead, I would consider anew whether the Fifth Amendment's Self-Incrimination Clause attached at Mr. Ka's supervised release revocation proceeding.[2]

## B.

Mr. Ka argues, based on *Haymond*'s guidance, that supervised release revocation proceedings are sentencing proceedings triggering the Fifth Amendment's protection against self-incrimination. There is no denying that the circuit courts have reached the opposite conclusion, as this Court did in *Riley*, based on the presumption that supervised release is "virtually indistinguishable" from parole and probation. *See, e.g.*, *United States v. Hulen*, 879 F.3d 1015, 1019–20 (9th Cir. 2018); *United States v. Neal*, 512 F.3d 427, 434–35 (7th Cir. 2008); *United States v. Carlton*, 442 F.3d 802, 807 (2d Cir. 2006).

---

[2] For example, in *United States v. Coston*, this Court considered a post-*Haymond* constitutional challenge to a different mandatory provision governing supervised release revocations, 18 U.S.C. § 3583(g). *United States v. Coston*, 964 F.3d 289, 294–96 (4th Cir. 2020). *Coston* concluded only that the district court did not commit plain error by upholding § 3583(g). *See id.* Notably, however, the *Coston* court applied *Haymond* to the question rather than simply applying parole and probation cases to conclude that supervised release revocation proceedings are not part of the criminal prosecution, such that no constitutional protections could possibly apply. *See id.*

But supervised release is different. Most fundamentally, supervised release differs in its intent. *See Haymond*, 139 S. Ct. at 2381–82. "[U]nlike parole, supervised release wasn't introduced to replace a portion of the defendant's prison term"; it is intended "only to encourage rehabilitation *after* the completion of [their] prison term." *Id.* at 2382 (internal quotations omitted). This rehabilitative intent results in a sentencing regime that persists well beyond the period of incarceration. *See id.*

Previously, a federal defendant "could serve as little as a third of his assigned prison term" before obtaining parole eligibility, or "might avoid prison altogether in favor of probation." *Id.* at 2381. If parole or probation was revoked, "the prison sentence a judge or parole board could impose . . . normally could not exceed the remaining balance of the term of imprisonment already authorized by the jury's verdict." *Id.* at 2377.

Then, "Congress overhauled federal sentencing procedures to make prison terms more determinate and abolish the practice of parole," substituting the supervised release system. *Id.* at 2382. "Now, when a defendant is sentenced to prison he generally must serve the great bulk of his assigned term." *Id.*; *see also United States v. Thompson*, 777 F.3d 368, 372 (7th Cir. 2015) ("Supervised release does not shorten prison time; instead it imposes restrictions on the prisoner to take effect upon his release from prison."). Then, upon release, the defendant must comply with "restrictions, imposed by the judge at

15

sentencing, called conditions or terms of supervised release, that . . . continue for a specific term of years (which can be life)." *Thompson*, 777 F.3d at 372.[3]

During that term of supervision, violations of the restrictions can result in a loss of the defendant's conditional liberty. If supervised release is revoked, the court can impose a new term of incarceration—usually capped by statute at one, three, or five years depending on the violation, but not temporally linked to any remitted prison sentence. *See id.*; 18 U.S.C. § 3583(e)(3). And that new term of incarceration can be followed by a new term of supervised release, which could also then be subject to revocation and reimprisonment, and so on. *See* Fiona Doherty, *Indeterminate Sentencing Returns: The Invention of Supervised Release*, 88 N.Y.U. L. Rev. 958, 1010 (2013) ("In cases in which a defendant's supervised release previously has been revoked, . . . [e]ach revocation is now potentially subject to a new reimprisonment term of between one and five years—without regard to any statutory aggregate maximum.").

---

[3] Given the size of the federal case load and considering resource limitations, some experts question whether the federal probation agency is administratively equipped to make genuinely individualized recommendations in sentencing reports about which conditions should apply. *See United States v. Siegel*, 753 F.3d 705, 710–11 (7th Cir. 2014). Those same concerns extend to whether probation officers can then effectively enforce those conditions in the name of rehabilitation, *not* punishment. *See id.* Likewise, they extend to whether sentencing courts are exercising sufficient discretion over probation officers' recommendations and providing sufficient justification—as required by *Booker* and its progeny—for the supervised release component of federal sentences. *See id.* at 711–12. *See generally* Christine S. Scott-Hayward, *Shadow Sentencing: The Imposition of Federal Supervised Release*, 18 Berkeley J. Crim. L. 180 (2013); Fiona Doherty, *Indeterminate Sentencing Returns: The Invention of Supervised Release*, 88 N.Y.U. L. Rev. 958 (2013).

Put differently, "[p]arole mitigates punishment; supervised release augments it—most dramatically when the defendant, having been determined to have violated a condition or conditions of supervised release, is given, as punishment, a fresh term of imprisonment." *Thompson*, 777 F.3d at 372. So while "the primary purpose of supervised release is to facilitate the reentry of offenders into their communities, rather than to inflict punishment," *United States v. Murray*, 692 F.3d 273, 280 (3d Cir. 2012), supervised release nevertheless "lengthens [the] sentence, unlike parole."[4] *United States v. Siegel*, 753 F.3d 705, 707 (7th Cir. 2014). Throughout the duration of the supervised release portion of that lengthened sentence, the defendant must comply with the bevy of conditions—of which there are over thirty to potentially be imposed—at the risk of losing their conditional liberty. *Id.* at 708.

---

[4] "The cumulative effect of these changes has made supervised release into a more expansive, more rigid, more punitive system." Schuman, *supra*, at 606 (referring to the supervised release system's expansion since its initial introduction as a rehabilitative program with no provision for revocations). Although supervised release was intended as a "discretionary supplement to prison," specifically "designed for people in particular need of post-release services," sentencing judges now impose supervised release in 99% of cases. Doherty, *supra*, *Indeterminate Sentencing*, at 997–98, 1015 (noting that supervised release is only required by statute in "less than half of all cases"). "[A]t its most expansive, the federal parole system supervised . . . about one-fourth of the number now on supervised release," and "federal probation has declined by about two-thirds since" the introduction of supervised release. *Id.* at 1014–15 ("Supervised release is now the dominant form of federal community supervision . . . . [and] is responsible for sending a significant number of offenders back to prison."). "Revocations have also become more common, and more than half of all revocations are for noncriminal conduct." Schuman, *supra*, at 606 ("One-third of all defendants are eventually found in violation of a condition of their release, . . . . [i]n 2009, over 10,000 people were in federal prison for violating their supervised release, which was between 5 and 10 percent of the total federal prison population."). Thus, "[w]hile Congress intended supervised release to *reduce* government interference in the lives of former prisoners," it has instead grown to vast scale and, for many people, extends involvement with the criminal system, raising the chances of reincarceration. *Id.* at 603–07. Our constitutional analysis should be informed by these developments.

Ultimately, then, supervised release revocation proceedings—unlike revocations of parole or probation—consider the imposition of *new* terms of incarceration. Yet, "between 1984 and 2019, the Supreme Court said almost nothing about how this new system of post-release supervision fit into the nation's constitutional framework." Schuman, *supra*, at 612. *Haymond*'s acknowledgment that the unique features of supervised release have constitutional ramifications should reasonably be expected to have implications for this Court.

One such implication is presented by this case, which invites this Court to reconsider the presumption that parole and probation case law apply equally to supervised release. *See Haymond*, 139 S. Ct. at 2382; *see also Johnson*, 529 U.S. at 724–25 (Scalia, J., dissenting) (arguing that "equat[ing] parole and supervised release is unpersuasive" because "the Sentencing Reform Act's adoption of supervised release was meant to make a significant break with prior practice"). We should accept the invitation and recognize what has long been true but, until now, has gone unaddressed: the supervised release system's differences from probation and parole necessitate additional constitutional protections.

Supervised release sanctions are "part of the penalty for the initial offense." *Johnson*, 529 U.S. at 700; *see also Haymond*, 139 S. Ct. at 2379–80 (plurality opinion); *Haymond*, 139 S. Ct. at 2386 (Breyer, J., concurring). And supervised release revocation can result in a new, additional term of incarceration. *See Thompson*, 777 F.3d at 372; *Siegel*, 753 F.3d at 707. Therefore, a supervised release revocation proceeding should be regarded as a "sentencing proceeding," and the same constitutional protections available at

18

the initial sentencing should attach.[5] *See Haymond*, 139 S. Ct. at 2377–80 (plurality opinion).

The Supreme Court has "repeatedly rejected efforts to dodge the demands of the Fifth and Sixth Amendments by the simple expedient of relabeling a criminal prosecution" as an "enhancement," "modification," or "postjudgment sentence-administration proceeding." *Id.* at 2379. Here, a supervised release revocation proceeding is a sentencing proceeding, regardless of what the government labels it. Its purpose is to modify the supervised release portion of the defendant's sentence—which is one portion of a single, unified sentence for the original offense—and potentially impose a new term of incarceration followed by a new term of supervised release. And it is well-established that sentencing is a critical stage of the criminal prosecution, such that the Fifth Amendment applies. *Mitchell v. United States*, 526 U.S. 314, 328 (1999); *Mempa v. Rhay*, 389 U.S. 128, 137 (1967).

Indeed, it is especially vital that the protection against the use of compelled statements applies at sentencing proceedings: "To say that [the defendant] ha[s] no right to remain silent but instead could be compelled to cooperate in the deprivation of her liberty would ignore the Fifth Amendment privilege at the precise stage where, from her point of

---

[5] There is intuitive appeal to the contrary position put forward by the dissent in *Haymond*: "[A] sentence is 'imposed' at final judgment, not again and again every time a convicted criminal wakes up to serve a day of supervised release and violates a condition of his release." 139 S. Ct. at 2395 (Alito, J., dissenting). "But saying it does not make it so." *Id.* at 2380 n.5 (plurality opinion). Rather, "[a]s *Johnson* recognized, when a defendant is penalized for violating the terms of his supervised release, what the court is really doing is adjusting the defendant's sentence for his original crime." *Id.*

19

view, it was most important." *See Mitchell*, 526 U.S. at 327–28. That principle applies just as forcefully to a revocation proceeding—where additional terms of incarceration and supervised release are considered—as it does to the initial sentencing.

Unlike parole and probation revocations, supervised release revocation proceedings uniquely allow for the imposition of new prison sentences. Just like the initial sentencing proceeding, then, constitutional protections should apply. Here, I would find that Mr. Ka's supervised release revocation proceeding was a sentencing proceeding, part of his "criminal prosecution," and the Fifth Amendment's protection against the use of compelled statements applied. Because the majority declines to do so, I respectfully dissent.